Filed 6/18/25  P. v. Sullivan CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LEE G. SULLIVAN,<br><br>        Defendant and Appellant. | A163607<br><br>(San Francisco City & County Super. Ct. Nos. CRI-13035657, SCN 221448-02)<br><br>**ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION** |

**THE COURT:**

Appellant's petition for rehearing is denied.

Pursuant to California Rules of Court, rule 8.264(c)(1), the opinion filed on May 30, 2025, shall be MODIFIED as follows:

1. On page 25, the two paragraphs in Discussion section B.4 are replaced in their entirety with the following:

> Sullivan also contends that the use of rap lyrics at trial violated the RJA.  As he concedes, however, his counsel forfeited this issue by failing to make an RJA objection before sentencing.  Further, because the issue was not litigated in trial court, the appellate record is inadequate to establish that his counsel's failure was deficient.

1

As our Supreme Court recently observed in *People v. Hin* (2025) 17 Cal.5th 401 (*Hin*), the admission of rap lyrics into evidence can invoke racist stereotypes and "inject[] racial bias into jury decisionmaking." (*Id.* at p. 477.) Here, in arguing that the use of rap evidence violated the RJA, Sullivan relies on multiple academic articles and studies on discrimination that are outside the appellate record. Contentions based on extra record reports or articles "can be raised only in a habeas corpus petition." (*People v. Seaton* (2001) 26 Cal.4th 598, 697; see also *People v. Nadey* (2024) 16 Cal.5th 102, 208 [explaining that "to the extent defendant would like to pursue his allegations based on extra-record evidence of discrimination . . . , this appeal is not the proper vehicle to do so"; that is, "instead, precisely what habeas corpus proceedings are designed to accommodate"]; *People v. Wagstaff* (2025) ___ Cal.App.5th ___ [declining to consider "multiple citations to sources outside the record" in connection with the appellant's RJA claim].) The record is also silent as to the reasons for defense counsel's failure to act. For these reasons, Sullivan's claim is more appropriately resolved in his habeas corpus petition. Absent further record development, Sullivan is unable to establish for purposes of this appeal that he had a meritorious RJA claim based on the use of rap evidence or that, relatedly, his counsel was deficient in failing to preserve the claim.

2. In the last paragraph on page 95, which continues into page 96 (Discussion section J.6), the following sentence and parenthetical citation are deleted:

> A trial court exercises broad discretion at each step, and its rulings will not be disturbed

absent a clear abuse of discretion.  (*People v. Ault* (2004) 33 Cal.4th 1250, 1260.)

The modifications make no change to the judgment.

BURNS, J.

WE CONCUR:

JACKSON, P. J.
SIMONS, J.

*People v. Sullivan (A163607)*

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEE G. SULLIVAN,<br><br>    Defendant and Appellant. | A163607<br><br>(San Francisco City & County Super. Ct. Nos. CRI-13035657, SCN 221448-02) |

In 2013, Jaquan Rice, Jr., was killed and his girlfriend, B.K., a minor at the time, was seriously wounded in a gang-related drive-by shooting.  A jury found Lee G. Sullivan guilty of murder, attempted murder, conspiracy to commit murder, assault with a firearm, simple mayhem, and participation in a criminal street gang as one of two shooters.  The jury also found true attendant firearm- and gang-related sentencing enhancements.  The same jury acquitted Sullivan's codefendant, Derrick Hunter, of the most serious charges but hung on other charges.  At Sullivan's sentencing, the trial court struck the substantive gang offense and all gang-related enhancements but imposed a 25-year term for one of his firearm enhancements. The court sentenced Sullivan to an aggregate prison term of 83 years to life.

Sullivan now appeals, arguing that his convictions must be reversed (at least in part) on the following grounds: (1) the trial court erred under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*)

1

and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); (2) the court's rulings during jury selection, and in admitting rap evidence, violated the Racial Justice Act of 2020 (Pen. Code, § 745; RJA);[1] (3) the court erroneously admitted unduly prejudicial gang evidence, including rap videos and rap lyrics; (4) the court erroneously admitted lay opinion identification testimony; (5) the court failed to provide a remedy after social media providers refused to produce private content in response to Sullivan's subpoena duces tecum; (6) the court improperly admitted an anonymous tip; (7) the kill zone instruction was incomplete; (8) the prosecutor engaged in misconduct; (9) the court inadvertently gave the jury access to extrinsic evidence; (10) the court failed to conduct an adequate inquiry into jury intimidation or misconduct after excusing a deliberating juror; and (11) cumulative error. Sullivan also contends that remand for resentencing is required due to postjudgment amendments to the relevant sentencing laws.

We accept the People's concession that Sullivan is entitled to be resentenced, under postjudgment amendments to the relevant statutes, and otherwise affirm.[2]

## BACKGROUND

The shooting occurred on June 24, 2013, just before 1:00 p.m., at the intersection of West Point Road and Middle Point Road in the Bayview/Hunter's Point neighborhood of San Francisco. B.K. had been sitting in Rice's lap at a bus shelter. This intersection was "ground zero" for an active criminal street gang—Westmobb. Big Block (also called Harbor Road) was a rival gang in the same neighborhood, but its territory was centered around the 700 block of Kirkwood. Rice was a member

---

[1] Undesignated statutory references are to the Penal Code.

[2] Sullivan has filed a related petition for a writ of habeas corpus (No. A170251), which we address by separate order.

2

of the Westmobb gang.  Before the shooting, he had told B.K. about trouble with "the Harbor crew."

The car used in the shooting, a green Ford Escape, was identified within minutes by law enforcement watching surveillance video.  One of the two videos played for the jury shows the two shooters—the first shooter wore a grey hoodie and shot out of the Escape's driver's side rear window, and the second shooter wore a black hoodie, white t-shirt, a baseball cap, black and white sneakers, and gloves, and shot after exiting the rear passenger side door.  The first shooter used a revolver.  The second used a semiautomatic nine-millimeter gun with an extended magazine and fired 23 rounds.  Despite the videos' somewhat poor resolution, the first shooter can be seen pretty clearly.  The second shooter's face is less clear and partly obscured by his cap.  The driver of the vehicle is not visible at all.  Eyewitnesses provided inconsistent descriptions of the driver's gender.

Within minutes, police stopped prosecution witness Renesha Lee[3] driving the rental car used during the shooting.  She was its sole occupant.  Renesha and Sullivan had been casually dating at the time.  When interviewed by police that day, Renesha initially lied, making up names and a story because she did not want anyone to get in trouble.  Eventually she identified codefendant Hunter and his 14-year-old brother (Q.H.) as two of three men who had borrowed her car that afternoon.  Renesha did not mention Sullivan's name until August 2013.

In the interim, two juvenile eyewitnesses (E.F. and Y.J.) told police that the first shooter—who fired from the driver's side window and yelled, " 'Ha, bitch ass [ni**a]—MOB!' "—was Q.H.

_____

[3] Because her last name is the same as Sullivan's first name, we use Renesha throughout this opinion to avoid any confusion.

3

Q.H. was ultimately charged with murder in juvenile court, where a wardship petition was sustained.

Police officers asked Renesha if one of several men affiliated with the Big Block gang had been the third man to borrow her car. However, after receiving an anonymous tip that Sullivan was one of the shooters, the police showed Renesha a photo lineup with Sullivan's photo. She said she knew him but that he did not get in her car.

On August 13, 2013, Renesha told the police "the truth"—which she repeated in her testimony at trial under a grant of immunity: Sullivan had borrowed the car from her to go to the store along with Hunter and Q.H. Sullivan was dressed in a black jacket and baseball cap. Minutes after they left, Renesha heard two different kinds of gunfire. A few minutes after that, Hunter and Q.H. returned in the car without Sullivan. Hunter was now driving. Renesha then drove the car to pick up Sullivan nearby, and he sat in the front passenger seat. He was no longer wearing the black jacket or baseball hat that he had been wearing when he borrowed the car; he was wearing a white t-shirt. She dropped all three men off with some friends, and Renesha overheard Sullivan say to another man affiliated with Big Block, " 'I blow Dutch when I smoke.' " Rice was known as "Dutch." At trial a gang expert testified the comment meant "I blow Dutch away with my gun" (which smokes after being fired).

Police found Sullivan's fingerprints inside the car on the front passenger door lever. Police also recovered three cell phones (Hunter's, Sullivan's, and Renesha's) from the Escape, a black and grey North Face jacket, and a black and grey glove found inside the jacket's front pocket. Sullivan's fingerprints were found on his phone. Renesha testified that, although she was not sure, she thought the jacket was Sullivan's.

Sullivan's DNA was found on the glove, along with at least three other individuals' DNA. Hunter and Q.H. were excluded

4

from the DNA mixture.  Gunshot residue was found on the glove's outside surface.

Before the shooting, Rice had made numerous gang-related posts on social media.  In March 2012, Rice posted a video to his Facebook account challenging rival gang members to come and find him on Westmobb's home turf.  He showed the bus shelter at the intersection of West Point Road and Middle Point Road and warned that they were " 'strapped up,' " or armed.  After the video was posted, rival gang members posted photos of themselves driving through the area.

Renesha testified that Rice's postings had upset Sullivan.  Rice also had a personal feud with Q.H. that was waged, at least in part, through social media posts.

When Sullivan was arrested, he denied both knowledge of the shooting as well as any romantic relationship with Renesha.  He did not believe he had ever been in Renesha's car.  No eyewitness identified Sullivan as the shooter.  At trial, B.K. did not recall being shot or how Rice died.  However, the prosecution played excerpts from her June 30, 2013 statement to police—in which she described the second shooter as a light-skinned African American man, who was about 5 feet, 7 inches tall, skinny, and wearing a black hoodie.

Consistent with B.K.'s description, in the surveillance video, the second shooter appears to be just slightly taller than the vehicle, which the parties stipulated was about 5 feet, 6 inches high.  Sullivan was approximately 5 feet, 7 inches tall and weighed between 134 and 145 pounds.

At trial, three San Francisco Police Department officers, viewing the surveillance video, testified that they recognized Sullivan as the second shooter.  Each of the officers had known Sullivan for many years—15 years, in Sergeant Daniel Manning's case.  Manning had been monitoring gang members on

surveillance cameras for about six months before the shooting as part of an investigation. Manning had no doubt that the shooter was Sullivan.

Officer Ochoa testified that he recognized Sullivan's mannerisms, movements, build, and shoes in the video. Ochoa said he knew Sullivan had the same shoes as the shooter because, a few weeks previously, he had noticed Sullivan's sneakers and the two had a conversation about how Ochoa had worn the same brand and style of shoes when he was younger.

Sullivan called an eyewitness—a member of Westmobb, Tony Befford—who testified that Sullivan was *not* the second shooter. Two other eyewitnesses, R.B. and E.F., indicated in out-of-court statements that Q.H. and Hunter were the two shooters. Although she did not witness the shooting, a woman who had been in a relationship with Sullivan at the time, Murlani Jones, was shown a screen shot from the video and testified that the second shooter did not look like Sullivan.

Sullivan also argued that neither the glove nor the jacket recovered from the car were the ones worn by the second shooter in the video. Although the gloves in the video appear to be white, the glove recovered from the car was black and gray. Police witnesses testified, however, based on their experience with the surveillance video footage and comparisons with other videos, that some colors of the gloves and other items in the video change and appear distorted.

The defense also argued that the size double-XL black and gray jacket found in the car was not Sullivan's size and appeared different than the black jacket (or hoodie) worn by the second shooter in the video. The defense presented evidence that other members of Big Block, Westmobb, and other gangs wore the same or similar styles of the shoes worn by the second shooter.

6

Several police officers testified about Sullivan's and Hunter's police contacts, congregation with each other and other known Big Block members (while throwing gang signs), and their proximity to or possession of firearms.

In reliance on this and other evidence, Sergeant Manning, the prosecution's gang expert, opined that Sullivan, Hunter, and Q.H. were members of Big Block, a criminal street gang, and that Rice was killed for Big Block's benefit. He explained that Rice was killed to send "a strong message to . . . other Westmobb gang members that if you're going to challenge Big Block . . . you were going to be killed."

Several hours after Rice's murder, a Westmobb member, Terrell Blay, went to Hunter and Q.H.'s home armed with an assault rifle but was intercepted by a police officer. The following evening, Westmobb members shot at Big Block members Matthew Higginbotham and Anthony Brown. Both incidents appeared to be retaliatory.

## DISCUSSION

### A.    *Batson/Wheeler* Motion

Sullivan, who is African American, contends the trial court improperly denied his *Batson/Wheeler* motion, which asserted that the prosecutor's exclusion of a prospective juror was discriminatory. We disagree.

### 1.

Both our state and federal constitutions forbid a prosecutor from striking even a single prospective juror on account of race. (*Foster v. Chatman* (2016) 578 U.S. 488, 499; *People v. Baker* (2021) 10 Cal.5th 1044, 1071.)

A trial court must analyze a defendant's *Batson/Wheeler* motion using a three-prong test. First, the defendant must make out a prima facie case with facts

7

sufficient to support an inference that the prosecutor had a discriminatory purpose in striking the juror at issue. Second, if the defendant succeeds in making such a showing, the burden shifts to the prosecutor to provide a race-neutral reason for the strike. Third, assuming the prosecutor does so, the court evaluates the prosecutor's proffered reasons and determines whether they are legitimate or pretextual. (*People v. Baker, supra*, 10 Cal.5th at p. 1071; accord, *Johnson v. California* (2005) 545 U.S. 162, 168.) The ultimate burden of persuading the court—that purposeful discrimination has occurred—rests with, and never shifts from, the opponent of the strike. (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613.) Generally, we review a trial court's denial of a *Batson/Wheeler* motion " ' " 'with great restraint,' " ' " considering "only whether substantial evidence supports its conclusions." (*Lenix,* at p. 613.)

In 2020, the Legislature passed Assembly Bill Number No. 3070 (2019-2020 Reg. Sess.), which enacted Code of Civil Procedure section 231.7. (Stats. 2020, ch. 318, §§ 1-3.) Among other changes, the new statute makes certain reasons for exercising a peremptory challenge—including having a negative experience with law enforcement—presumptively invalid. (Code Civ. Proc., § 231.7, subds. (e)-(g), (j).) It also provides that the court must sustain the objection if "there is a substantial likelihood that an objectively reasonable person would view race . . . as a factor in the use of the peremptory challenge." (*Id.*, § 231.7, subd. (d)(1).) However, the new law only applies to trials in which jury selection begins on or after January 1, 2022. (*Id.*, § 231.7, subd. (i).) Because jury selection in this case occurred in 2019, this statute does not lessen Sullivan's burden.

## 2.

In his responses to the juror questionnaire, J.W. (Juror Badge No. 5057694) reported that he owned a funeral home, where he served as mortician and grief counselor. He wrote that he could not be fair and impartial because of his work attending to the families of violent crime victims. J.W. responded to one question—asking whether he listened to rap music—by stating that it was "absurd!" He responded similarly to another question asking whether he had any "strong opinions" about people who live in public housing. Finally, J.W. wrote that he had "a genuine concern" about his ability to serve, based on the questionnaire itself, and worried that serving would potentially impact his business.

When the court asked J.W. about his ability to be fair and impartial, J.W. expressed reservations, citing his work as a mortician and saying he had "been on both sides of this." He explained that he viewed his frequent work with the victims and families of violent crimes as a "direct conflict" with serving as a juror in this case. He added that he needed to preserve his "peace of mind."

Asked by the court to elaborate, J.W. said that there was the potential that he could not be objective because, through his grief counseling, he felt overly sympathetic to victims and their families. J.W. further noted that the charges brought up memories of his god brother's murder (from 12 years prior), which J.W. believed was "a personal conflict."

Another prospective juror (Juror Badge No. 4802469) "[a]gree[d] [s]omewhat" with a statement in the juror questionnaire—that African Americans commit more crime than people of other races or ethnic groups. Hunter's counsel then asked Juror No. 4802469 whether he crosses

9

the street to avoid African Americans and he responded, "I imagine I do to some extent[,] but probably not any more than a lot of other people."

After questioning this juror, Hunter's counsel gave J.W. the floor to comment. Referring to Juror No. 4802469's comments, J.W. said he felt "really torn" about serving as a juror. J.W. mentioned his struggles, as an African American man, being subject to racial biases and misperceptions. Apparently referring to the juror questionnaire, he said the statements about African Americans and crime were "completely absurd."

In response to questions from Sullivan's counsel, J.W. explained that he could give a defendant a fair trial. But he quickly reiterated that his work as a grief counselor would make serving as a fair juror "real tough." Asked if he would convict someone because he felt bad for the victim, J.W. said, "No, no." But J.W. again brought up his "peace of mind," adding that the trial was "the last thing" he wanted to "have on [him]." He readily agreed that he could sit on a jury if, after hearing the evidence, he believed the prosecution had not met its burden and had charged the wrong person.

The prosecutor asked J.W. whether he could give the prosecution a fair trial, but he never directly answered the question. J.W. first asked for clarification. The prosecutor explained that jurors were expected to be impartial. When asked if the victims' race would influence his ability to objectively sit as a juror, J.W. said that the subject matter would be difficult for him (having worked with gunshot victims) and that he felt far too many young African American people die from gun violence.

The prosecutor asked J.W. if he believed that serving on the jury in a homicide case would impact future business. J.W. said that "makes it tough" and repeated that he primarily works with victims' families. The prosecutor commented that if J.W. were to serve on the jury, he would not be allowed to discuss his

10

occupation and background during deliberations. J.W. said he would comply but added that he would be "thinking about [his work]" and that "weigh[ed] on" him. J.W. also said he was in a "tough position" because, in his mind, "it cuts both ways."

Over Sullivan's *Batson/Wheeler* objection, the prosecutor used his seventh and final peremptory challenge to remove J.W. The matter was heard outside the presence of the jurors. Sullivan's counsel argued the court excused three of the five African American prospective jurors for cause or hardship. Sullivan's counsel said J.W. was "a perfectly fine juror, African American, owns a funeral home, well-educated, well-spoken." She did not specifically address J.W.'s statements.

Hunter's counsel joined in the motion and similarly noted the three African Americans excused for cause by the court over defense objection. He argued there was "no justification" to exercise a peremptory challenge against J.W. and that the challenge must be racially motivated. Hunter's counsel also asserted that the prosecutor "excessive[ly]" questioned A.R.—who was the last remaining African American in the venire.

The court concluded the *Batson/Wheeler* motion was insufficient and denied it, citing defendants' failure to make a prima facie case. The court said "extensive questioning" of J.W. showed that he was "very forthcoming" with his concerns, "the reasons he did not want to serve as a juror," and his reservations about his ability to be fair and impartial.

After the court's ruling, the prosecutor added that defense counsel had not demonstrated anything aside from "their impressions of [jurors'] races." The prosecutor said J.W. gave "numerous reasons why he would have difficulty

sitting and judging fairly this case.  Some were specific to him and his racial background, which he talked about frankly, and he talked about emotively, although he wasn't overwhelmed by it." The prosecutor said that "the main issue" was J.W.'s work as a funeral director and grief counselor.  After summarizing J.W.'s statements about the impact of his job and how it made him sympathetic towards victims, the prosecutor noted how J.W. was personally offended by one juror's opinion about racial disparities in crime rates.  The prosecutor said it seemed that, based on J.W.'s "visible reaction" to that juror, he could be unwilling to deliberate.  The prosecutor also noted that, although J.W. said he was biased in favor of victims, he also audibly agreed with another juror who stated a belief that the police tend to "shoot first and ask questions later."  In summary, there were "numerous reasons to grant [J.W.'s] request . . . to not sit on the jury."

**3.**

We agree with the trial court's conclusion that Sullivan failed to demonstrate a prima facie case that J.W. was excused because he was African American.

The moving party establishes a prima facie case "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  (*Johnson v. California, supra*, 545 U.S. at p. 170.)  There is no requirement to show a systematic exclusion of multiple jurors based on their membership in a protected class.  (*People v. Battle* (2021) 11 Cal.5th 749, 773 (*Battle*).)  Instead, the court considers all the relevant circumstances to determine whether the record supports an inference that the prosecutor excused one or more prospective jurors because of race.  (*People v. Rhoades* (2019) 8 Cal.5th 393, 429 (*Rhoades*).)  Ordinarily we review the trial court's first prong decision deferentially, for substantial evidence.  (*Battle*, at p. 772.)  We will affirm the trial court's ruling where the record

12

suggests "grounds upon which the prosecutor might reasonably have challenged the juror[]." (*People v. Farnam* (2002) 28 Cal.4th 107, 135.)

Certain types of evidence are especially relevant, including whether the prosecutor has struck most or all of the members of an identified group from the venire; whether the prosecutor has used a disproportionate number of their strikes against members of the same group; whether the prosecutor has engaged prospective jurors from that group in only superficial voir dire; whether the defendant is a member of the identified group; and whether the victim is a member of the group to which a majority of remaining jurors belong. (*Rhoades*, *supra*, 8 Cal.5th at p. 429.) We may also consider nondiscriminatory reasons for the prosecutor's challenge that " ' "necessarily dispel any inference of bias," ' " if those reasons are clearly established in the record. (*Ibid*.)

There is little evidence to support an inference of discrimination. Sullivan cannot show that the prosecutor peremptorily challenged most or all the African American prospective jurors or that he used a disproportionate number against African Americans—because the prosecutor only exercised one of his seven challenges against an African American prospective juror. (*Rhoades*, *supra*, 8 Cal.5th at pp. 429-430.) There is no dispute among the parties that there were five African American prospective jurors in the venire—A.D., R.A., J.G., J.W., and A.R. The court excused A.D., J.G., and R.A. for cause or hardship. Challenges for cause are distinct from peremptory strikes. (See *Rhoades,* at p. 435.) And Sullivan does not argue that any of the for-cause challenges were specious. (Cf. *Battle, supra*, 11 Cal.5th at pp. 782-783 [in some cases, "[s]pecious" for-cause challenges might support an inference of bias].)

13

Furthermore, A.R. was not challenged by any party and was seated as Juror No. 9. In these circumstances, it is very difficult, although not impossible, to make a prima facie case. (*Battle*, *supra*, 11 Cal.5th at p. 776.) Our review shows no indication that the prosecutor's voir dire of J.W. was improper or unusual in any way. (See *Battle*, *supra*, at p. 783; *People v. Bryant* (2019) 40 Cal.App.5th 525, 539.)

Sullivan notes that both he and J.W. are African American. This circumstance is highly relevant and requires careful scrutiny. (See *Rhoades*, *supra*, 8 Cal.5th at p. 430; see also *Flowers v. Mississippi* (2019) 588 U.S. 284, 297.) But the record reveals no other case-specific reasons why the prosecutor would be motivated to exclude a particular class of jurors. (*Rhoades*, at p. 430.) The victims in this case were also African American. We are not inclined to find a prima facie case based solely on the fact that the defendant and challenged juror share the same racial identity. (*People v. Scott* (2015) 61 Cal.4th 363, 384-385; cf. *Johnson v. California*, *supra*, 545 U.S. at p. 168.)

Any inference of bias is further weakened because the record reveals that J.W. had obvious race-neutral characteristics that a reasonable prosecutor would seek to avoid. (See *Rhoades*, *supra*, 8 Cal.5th at pp. 431-435.) J.W.'s unwillingness to serve as a juror in this case is clearly established by the record. He had a strong, emotional reaction to the charges, the questionnaire, and fellow jurors' statements during voir dire. J.W.'s reaction did not subside even after the People *and* defense counsel all carefully explained to the entire panel why the questionnaire asked about certain topics and the need to openly discuss complex topics. Despite those clarifications, J.W. maintained that his role as a mortician and grief counselor was a "direct" and "personal" conflict with his duties as a juror and said he was unable to ignore those concerns. He only readily agreed that he could sit on a jury if he believed the prosecution had not met its burden and

otherwise repeatedly referenced his "peace of mind," adding that the trial was "the last thing" he wanted to "have on [him]." J.W. was subject to challenge for cause based on these answers. (See *People v. Solomon* (2010) 49 Cal.4th 792, 836; *People v. Cunningham* (2001) 25 Cal.4th 926, 981.)

To a reasonable prosecutor, these readily-apparent, nondiscriminatory grounds would provide cause for a challenge. (*Rhoades*, *supra*, 8 Cal.5th at pp. 431-434; *People v. Parker* (2017) 2 Cal.5th 1184, 1213 [reluctance to serve]; *People v. Hensley* (2014) 59 Cal.4th 788, 803 [rigid jurors who may be divisive during deliberations]; *People v. Jones* (2013) 57 Cal.4th 899, 918 [juror's experience in counseling or social services was a legitimate, nondiscriminatory basis supporting a prosecutor's peremptory challenge].)

Having reviewed all the circumstances, we agree with the People that substantial evidence supports the trial court's finding that Sullivan failed to establish a prima facie case of racial discrimination. (See *People v. Parker, supra,* 2 Cal.5th at pp. 1212-1213.)

**4.**

Sullivan insists we cannot review this case at the prima facie stage. He says our review should start at the third stage—or alternatively that the trial court necessarily erred at the first step—because the prosecutor's reasons for peremptorily challenging J.W. are purportedly "facially discriminatory." According to Sullivan, the prosecutor's reasoning was not race-neutral because the prosecutor justified the strike (in part) by referring to the offense J.W. took to another prospective juror's opinion about racial disparities in crime rates.

15

After the other prospective juror stated his belief and admitted that he was more fearful of African American men, J.W. lamented that he often did not feel seen as a human being and said, "these perceptions . . . about black people . . . [that they're] more likely to commit a crime, like, it's completely absurd." Thus, Sullivan claims that one of the prosecutor's reasons for striking J.W. was dependent on racial stereotypes (the fact that J.W. disagreed and took offense to them) and, accordingly, the trial court erred in finding no prima facie case.

Sullivan's arguments are unpersuasive. This is a first prong case because the trial court concluded that Sullivan failed to establish a prima facie case *before* the prosecutor stated his reasons for peremptorily striking J.W. (See *People v. Scott*, *supra*, 61 Cal.4th at pp. 386-389, 391-392; *People v. Bryant*, *supra,* 40 Cal.App.5th at pp. 536, 539.) Sullivan's selective reading of the record does not compel us to conduct a third-stage analysis. (Cf. *People v. Scott*, *supra*, 61 Cal.4th at pp. 386-389, 391-392 [when prosecutor proffers a "facially discriminatory justification" this circumstance would raise inference of discrimination and trigger review under next step].) We need not consider Sullivan's argument involving comparative juror analysis. (*People v. Bonilla* (2007) 41 Cal.4th 313, 350; *People v. Farnam, supra,* 28 Cal.4th at p. 135.)

### B.      Racial Justice Act

Sullivan asserts, for the first time on appeal, several violations of the Racial Justice Act (RJA), which became effective on January 1, 2021, before his sentencing. (§ 745; Stats. 2020, ch. 317, § 3.5.) He contends that the prosecutor's peremptory challenge to J.W., statements by other prospective jurors during voir dire, and the juror questionnaire (prepared by his attorney) violated the RJA. In addition, he contends that the introduction of rap videos and lyrics violated the RJA. We conclude that

Sullivan forfeited several of his RJA claims and his remaining contentions lack merit.

## 1.

The Legislature's stated intent in enacting the RJA is "to eliminate racial bias from California's criminal justice system." (Stats. 2020, ch. 317, § 2(i).).) To further that important goal, section 745, subdivision (a), provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a); accord, *People v. Lashon* (2024) 98 Cal.App.5th 804, 809 (*Lashon*).)

As relevant here, the RJA is violated if the defendant proves by a preponderance of the evidence that the judge, an attorney, a law enforcement officer, an expert witness, or a juror exhibited racial bias or animus toward the defendant or "used racially discriminatory language about the defendant's race . . . whether or not purposeful." (§ 745, subds. (a)(1)-(2).) The prohibition on use of discriminatory language "does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(2).) " 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (§ 745, subd. (h)(4).)

17

**2.**

As an initial matter, we reject Sullivan's RJA challenge to the prosecutor's use of a peremptory strike against J.W. As discussed in connection with the *Batson-Wheeler* claim, the prosecutor's challenge to J.W. neither "exhibited bias or animus towards" Sullivan nor "used racially discriminatory language about" Sullivan's race. (§ 745, subds. (a)(1)-(2).)

**3.**

As for Sullivan's remaining RJA claims based on statements made during voir dire, he has forfeited them because he did not raise them below despite having an opportunity to do so. Further, we are unpersuaded by Sullivan's arguments that his counsel's failure to preserve the issue constituted ineffective assistance of counsel.

**a.**

At no time during the trial court proceedings, whether during voir dire or in a post-trial motion, did Sullivan preserve a claim based on racially discriminatory statements contained in the juror questionnaire or made by prospective jurors during voir dire.

It is true, as Sullivan argues, that the RJA was not enacted until after his 2019 trial. But his counsel could have fashioned a different questionnaire, and counsel could have raised Sullivan's concerns about discriminatory statements by prospective jurors during voir dire. (Cf. *People v. Elliott* (2012) 53 Cal.4th 535, 572 [holding that defendant forfeited claim of racial bias during jury selection by failing to raise the claim at trial].) Notably, the defense did not use all its peremptory challenges, and each of the defense's challenges for cause was successful. Had Sullivan brought his concerns to the court's attention during voir

19

dire or exercised his remaining peremptory challenges, he could have precluded any potential bias from affecting the trial. (Cf. *People v. Simon* (2001) 25 Cal.4th 1082, 1104 [explaining that without a forfeiture rule, a defendant might purposefully " 'delay[] the raising of the claim in the hopes of an acquittal, with the thought that if those hopes did not materialize, the claim could be used to upset an otherwise valid conviction' "], quoting *Davis v. United States* (1973) 411 U.S. 233, 241.)

Nor did Sullivan raise his discrimination concerns in the trial court once the RJA was enacted. By the time Sullivan was sentenced on September 17, 2021, the RJA had been in effect for more than eight months. (§ 745, subd. (j)(1) [providing that section 745 applies to "all cases in which judgment is not final"]; *Lashon, supra*, 98 Cal.App.5th at pp. 810, 816.) Yet he did not file a motion under (or otherwise raise) the RJA. (See *Lashon,* at pp. 810-816 [holding that RJA claims may not be raised for the first time on appeal where the defendant's trial court judgment was not final until after the effective date of the RJA]; *People v. Singh* (2024) 103 Cal.App.5th 76, 113-114 (*Singh*) [agreeing with *Lashon*]; *see also People v. Simmons* (2023) 96 Cal.App.5th 323, 337 ["Counsel should . . . have raised the issue at the first opportunity after the [RJA] took effect, appellant's sentencing hearing."].) Further, Sullivan's RJA claims do not come within the exception to forfeiture for pure questions of law, as RJA claims like Sullivan's necessarily rely on the trial court record. (See *Singh,* at p. 116; accord, *Lashon*, at p. 811.) Accordingly, Sullivan's RJA claims based on statements made during voir dire are forfeited.

### b.

Sullivan argues in the alternative that if his RJA claims based on voir dire are forfeited, then his trial counsel provided constitutionally deficient representation. (See *Strickland v.*

*Washington* (1984) 466 U.S. 668, 687-698 (*Strickland*).) We disagree.

## i.

Sullivan's principal RJA claim is based on the juror questionnaire prepared by his own trial counsel for use in voir dire. The trial court granted defense counsel's unopposed request to use a written jury questionnaire, which she prepared, during jury selection.

The only question that Sullivan appears to challenge on appeal is question 32, which asked jurors to consider their agreement with (among others) the sixth statement: "*African-Americans commit more crime* than people of other races or ethnic group[s]." (Italics added.) Sullivan maintains that inclusion of the italicized statement "suggested to prospective jurors that the court and attorneys believed this statement to be true." He contends it "likely conditioned some jurors to accept the implied [stereotype] that African Americans are prone to crime."

Sullivan's concern about his attorney's question cannot be taken lightly; the statement, if endorsed, would clearly be racially offensive. (See *Buck v. Davis* (2017) 580 U.S. 100, 121 (*Buck*) [observing that the notion that people with black skin would be more likely to commit future violence represented a "particularly noxious strain of racial prejudice"].) But the questionnaire itself did not endorse the statement. Instead, the questionnaire instructed, "Please check the box that is closest to your opinion," and provided a range of possible responses from "Agree Strongly" to "Disagree Strongly," including "No Opinion." Further, the question presented eight other unrelated opinion statements in addition to the challenged one, and jurors did not necessarily agree with all or even any of them. For example, one juror selected "Disagree Strongly" for seven of the statements and "Disagree Somewhat" for the remaining two.

21

On its face, the purpose of the questionnaire in general and this question specifically was to draw out prospective jurors' opinions that may be pertinent to their ability to serve impartially. According to defense counsel, she believed it necessary to describe certain beliefs—held by some members of society—to ferret out any of the jurors' racial biases *and ensure that Sullivan would receive a fair trial.* An objective observer would not view the substance of defense counsel's question as an explicit or implicit appeal to racial bias. (§ 745, subds. (a)(2), (h)(4).) Further, a statement that "relat[es] language used by another that is relevant to the case" does not violate the RJA under the circumstances here. (§ 745, subd. (a)(2).) Nor would finding a violation in these circumstances—where defense counsel reasonably asked about jurors' potential biases for the purpose of ensuring a fair trial—further the Legislature's intent to eliminate racial bias from criminal justice proceedings. (Stats. 2020, ch. 317, § 2(i).) As a result, Sullivan's claim lacks merit and counsel's decision not to raise an RJA claim on this basis was not deficient.

**ii.**

Sullivan also argues that three prospective jurors (Juror Badge Nos. 4853331, 4802469, and 4783984) "expressed bias against African Americans on their questionnaires" by checking the "[a]gree [s]omewhat" or "[a]gree [s]trongly" boxes in response to the sixth statement in question 32 (discussed above). He similarly contends that these same prospective jurors, plus a fourth (4853308), exhibited racial bias against African Americans in their responses to counsel's follow-up questions during voir dire. Although we are troubled by several of these prospective jurors' statements, Sullivan is unable to prevail on his ineffective assistance claims.

First, Juror No. 4783984 was excused for cause and did not serve on Sullivan's jury. Thus, Sullivan cannot show with respect

22

to Juror No. 4783984 that a "juror" used discriminatory language about his race or exhibited bias or animus towards him because of his race. (§ 745, subd. (a)(2).) For the same reason, Sullivan cannot show that his counsel was ineffective in failing to preserve an RJA claim on this basis in trial court.

With respect to Juror No. 4853308, Sullivan contends that this juror, an African American who spoke with an accent, expressed bias against native born African Americans. Sullivan relies on two statements by this juror. In one exchange, the juror discussed "the things that my kids went through as black boys growing up in the neighborhood [and] the way people would react to them. When they hear my accent it's completely different. Oh, you are not one of them, but I say no, those are my kids so I am one of them, you know. So if you want to treat me differently, you got to treat them the same way." In the second statement, after relating an incident in which their son was racially profiled, the juror stated: "when they hear my accent it's like, oh, you're a king, you're different from them. It's not like that for me." Neither statement relied upon by Sullivan indicates that the juror personally made a discriminatory statement or otherwise exhibited bias towards African Americans. In both exchanges, the juror rejected the notion that he should be treated differently based on his accent. Further, as discussed, the juror's relating of statements by others does not amount to an RJA violation under the circumstances here. (§ 745, subd. (a)(2).) Accordingly, defense counsel's failure to preserve an RJA claim on this basis was not deficient.

Sullivan next argues that Juror No. 4853331's response—that he "[a]gree[d] [s]omewhat" with the statement that African Americans commit more crime than

other groups—violated the RJA. Sullivan rightly asserts that the juror's endorsement of the statement, which attributes a pernicious stereotype to a group of people based on race, is racially offensive. (See *Buck*, *supra*, 580 U.S. at p. 121.) Despite the juror's endorsement of a racial stereotype, however, Sullivan's counsel affirmatively agreed with the prosecution to include the individual on the jury. Indeed, the record indicates that this juror held views favorable to the defense. The juror indicated that when they had previously served on a jury, the defendant was "over prosecuted" and the case "should never ha[ve] come to trial"; that "most of the people" who live in housing projects "are just struggling to survive"; that they "[d]isagree[d] [s]trongly" with the statement that if the government brings a defendant to trial, the defendant is probably guilty; and that they "[d]isagree[d] [s]omewhat" that compassion for the victim is important to their verdict in this case. Accordingly, defense counsel's decision to agree to seat this individual on the jury was not objectively unreasonable. (See, e.g., *Cullen v. Pinholster* (2011) 563 U.S. 170, 196 (*Cullen*) [explaining that in determining whether an attorney's performance was deficient under the objective inquiry called for in *Strickland*'s first step, "[t]he Court of Appeals was required not simply to 'give [the] attorneys the benefit of the doubt,' . . . but to affirmatively entertain the range of possible 'reasons Pinholster's counsel may have had for proceeding as they did' "].)

As Sullivan asserts, Juror No. 4802469 made very troubling statements concerning African Americans. The juror indicated that he "[a]gree[d] [s]omewhat" with the stereotype that African Americans commit more crimes than others. He stated that he "suppose[d]" that his belief made him "more fearful of African Americans." And, when asked whether he crosses the street to avoid an African American, the juror responded: "I imagine I do to some extent but probably not any more than a lot

24

of other people."  Notwithstanding the juror's statements, Sullivan's counsel affirmatively agreed to seat him on the jury.

Sullivan's counsel could have reasonably believed that countervailing factors justified allowing Juror No. 4802469 to serve.  The juror selected "[d]isagree [s]trongly" in connection with the statements that if the government brings a defendant to trial, the defendant is probably guilty; an innocent person is unlikely to be charged or tried for a serious crime; and compassion for the victim is important to his verdict.  During voir dire, the juror asserted that his agreement that African Americans commit more crimes than others would not impact his deliberation and judgment of Sullivan.  He agreed that some people arrested by police are not guilty, and he affirmed that if he served on the jury, he would "look to the facts, look to the [court's] guidance."  And the juror had experience as a juror, having served on five or six trials including cases involving murder, child molestation, and robbery; when he served as the jury foreperson in the child molestation case, a mistrial was declared due to lack of unanimity.  In addition, he had been a member of the American Civil Liberties Union, an organization that works on criminal justice and other social justice issues, for 40 years.  Sullivan's counsel had an opportunity to question this juror and was able to observe his demeanor throughout voir dire.  Accordingly, Sullivan is unable to demonstrate that his counsel's decision to seat this juror was objectively unreasonable.  (*Cullen*, *supra*, 563 U.S. at p. 196.)

It is true that even after the RJA was enacted, Sullivan's trial counsel did not bring an RJA motion in trial court.  Because defense counsel had affirmatively agreed to seat Juror Nos. 4853331 and 4802469 on the jury, however, an RJA challenge on that basis would have lacked merit.

(Cf. *People v. Holmes, McClain & Newborn* (2022) 12 Cal.5th 719, 821-822 [" 'Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error.' "]; *People v. Thompson* (2010) 49 Cal.4th 79, 96-97 [holding that defendant had waived any challenge to procedure whereby by prospective jurors could be dismissed solely based on their written questionnaires, where "trial counsel explicitly endorsed the procedure defendant now challenges on appeal," and trial counsel's decision was reasonable]; *People v. Morris* (2003) 107 Cal.App.4th 402, 413-414 [rejecting a defendant's *Wheeler* challenge where the "[d]efendant did not suffer a cognizable injury because *he was tried by a jury of his own choosing*."].) As a result, defense counsel's failure to bring an RJA motion on these grounds was not deficient.

**4.**

Sullivan also contends that the admission of rap lyrics at trial violated the RJA. As he concedes, however, his counsel forfeited this issue by failing to make an RJA objection before sentencing. Further, his failure to brief this issue adequately in his opening brief has forfeited the argument on appeal.

As our Supreme Court recently observed in *People v. Hin* (2025) 17 Cal.5th 401 (*Hin*), the admission of rap lyrics into evidence can invoke racist stereotypes and "inject[] racial bias into jury decisionmaking." (*Hin,* at p. 477.) The two-sentence argument in Sullivan's opening brief, however, fails to identify any specific portion of the record in support of Sullivan's contention that the RJA was violated here. (*See* Cal. Rules of Court, rule 8.204(a)(1)(B)-(C).) Accordingly, the argument is forfeited.

26

## C.      Admission of Gang Evidence & Rap Videos/Lyrics

Sullivan maintains that his substantive gang conviction, gang enhancements, and other convictions must be reversed for several reasons based on the erroneous admission of gang evidence, rap videos, and rap lyrics.  We disagree.

### 1.

Prior to trial, Sullivan moved in limine for an Evidence Code section 402 hearing to set parameters around the prosecution's proffered gang evidence and to exclude any case-specific hearsay pursuant to *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) as applied by our Supreme Court in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).  Sergeant Manning, the prosecution's gang expert, testified for eight days at the evidentiary hearing.  Hunter subsequently filed written objections to portions of Manning's proposed testimony, including testimony concerning Big Block predicate crimes.  Neither defendant moved to bifurcate the substantive gang charges or gang enhancements from the other charges.

At the conclusion of the hearings, the prosecutor stated he would limit the predicate or pattern offenses to those of which Manning had personal knowledge, and that older offenses were offered to "bridge the gap" between the instant offense and a federal indictment of older Big Block members from the year 2001.

At trial, Manning testified that he had been assigned to the Bayview District for 25 years and had worked on the gang task force (in the Bayview) for 12 years.  During that time, he investigated various gang-related crimes in the area.  According to Manning, at least nine different gangs, including Big Block and Westmobb, were active in Bayview/Hunters Point in 2013.  Each gang has its own

27

"home turf," where its members predominately work and ostensibly feel safe.

Manning testified that Big Block has existed since before 2000. Its primary activities are narcotics sales, home and auto burglaries, robberies, possessing firearms, and shootings. Various Big Block members engaged in a continuous pattern of criminal activity between 2005 and 2013. As of 2013, he opined, Big Block had about 30 to 60 active members.

Various officers said they saw Sullivan, Hunter, and Q.H. hanging out with each other and/or other known Big Block members on multiple occasions. These included instances where police, for example, searched Sullivan's room and found the case for an assault weapon, police stopped a car Sullivan was a passenger in and found a handgun under the driver's seat, and police found a gun and a gun magazine (from a different gun) in a vacant apartment occupied by Sullivan and another known Big Block member. The prosecution presented similar evidence regarding Hunter.

The prosecution also introduced evidence from social media, rap lyrics, and rap videos to establish Sullivan's gang membership. This included evidence from various Big Block members' social media accounts, including Sullivan and Hunter. One image showed Sullivan using his hands to "[throw] a 7" (for the 700-block of Kirkwood) while simulating shooting with his other hand. The jury was shown several Big Block rap videos, including some that either depicted Sullivan and Hunter or referred to them.

Manning opined that the shooting in this case was done during broad daylight to send a "strong message" to Westmobb that challenging or taunting Big Block members (either online or in person) could be fatal.

28

The jury found Sullivan guilty of, among other things, actively participating in a criminal street gang (§ 186.22, subd. (a)) (count 12) and found true multiple gang enhancements (§ 186.22, subd. (b)(1)(C)). At sentencing, however, the trial court struck count 12 and all the gang enhancements "in all instances" in the interests of justice.

## 2.

### Evidence Relating to Sullivan's Gang Participation Conviction & Gang Enhancements

We first address Sullivan's challenges to his gang participation conviction and gang enhancements.

### a.

Sullivan relies in part on Assembly Bill No. 333 (2021–2022 Reg. Sess.) (AB 333), known as the STEP Forward Act of 2021, which became effective on January 1, 2022, while his appeal was pending. (Stats. 2021, ch. 699, § 1.) AB 333 "amended . . . section 186.22 by imposing new substantive requirements relating to gang enhancements and the criminal offense of gang participation. (Stats. 2021, ch. 699, § 4.) [AB 333] also added section 1109, which provides that, if requested by the defense, a trial court must try a gang enhancement charge separately from the underlying offense. (§ 1109, subd. (a); Stats. 2021, ch. 699, § 5.) The statute likewise provides that gang-participation offenses must be tried separately from all other counts that do not require gang evidence as an element of the crime. (§ 1109, subd. (b); Stats. 2021, ch. 699, § 5.)." (*People v. Burgos* (2024) 16 Cal.5th 1, 7 (*Burgos*), fn. omitted.)

### b.

To begin, we reject Sullivan's argument that his gang participation and gang enhancement convictions must be reversed based on section 1109's new provisions concerning

bifurcation of trials of gang participation offenses and gang enhancement charges. In *Burgos*, our Supreme Court held that section 1109 does not apply retroactively to nonfinal cases like Sullivan's. (*Burgos, supra*, 16 Cal.5th at p. 24.) *Burgos* explained that the exception to prospective application of statutes first recognized in *In re Estrada* (1965) 63 Cal.2d 740 applies to statutory amendments that narrow the scope of criminal liability or mitigate the punishment for a criminal offense. (*Burgos*, at pp. 12-15.) *Burgos* reasoned that "[b]ecause the procedures established by section 1109 do not alter the criminality of defendant's conduct or the severity of punishment," the *Estrada* exception does not apply to section 1109. (*Burgos,* at p. 21.)

**c.**

As for Sullivan's remaining arguments for reversal of his gang participation and gang enhancement convictions, we conclude that portion of his appeal is moot because the trial court has already granted him the relief he requests.

"As a general rule, we do not issue advisory opinions indicating ' "what the law would be upon a hypothetical state of facts." ' " (*People v. Slayton* (2001) 26 Cal.4th 1076, 1084, quoting *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 171; *see also People v. Chadd* (1981) 28 Cal.3d 739, 746.) We have discretion to consider a moot issue that involves a question of serious public concern that would otherwise elude resolution, however. (*People v. DeLeon* (2017) 3 Cal.5th 640, 646 (*DeLeon*).)

Sullivan does not explain how his remaining challenges to his gang-related conviction and enhancements are properly before us given the trial court's decision to strike count 12, the substantive gang offense (§ 186.22, subd. (a)) and all the gang enhancements (§ 186.22, subd. (b)(1)(C)). Even assuming (without deciding) that they are properly before us, none of the issues identified by Sullivan have escaped appellate review or are

30

likely to do so as the above-cited cases reflect. (*See DeLeon, supra*, 3 Cal.5th at p. 646.) Accordingly, we disregard Sullivan's challenges to the gang evidence to the extent they relate to his gang participation conviction and enhancements. We therefore turn to Sullivan's arguments that the unlawful admission of gang evidence prejudiced his trial for murder, attempted murder, and other remaining offenses.

### 3.

### Evidence of Other Guns, Other Murders, and Gang Members Attending the Trial

Sullivan argues that his remaining convictions must be reversed because the trial court erred in admitting highly prejudicial evidence of guns not used in the instant crime and other gang-related murders, and of the presence of gang members at the trial. He contends that the admission of this evidence "so overwhelmed the trial" that it not only constituted an abuse of discretion under Evidence Code section 352 but also amounted to a due process violation. Because his counsel neither requested bifurcation nor objected on these grounds at trial, however, Sullivan has forfeited these arguments. Further, Sullivan is unable to show on this record that his counsel's failure to do so constituted ineffective assistance.

### a.

Before the trial, Sullivan's motion in limine unsuccessfully sought to exclude all gang evidence from the trial. The trial court told the prosecutor, "I'm certainly going to let you present gang-related evidence and evidence relating to each of the defendants and their alleged participation in the gangs to make a case." Although the trial court was inclined to rule that the prosecution's gang-related exhibits were admissible, the court made clear that the exhibits would "still all be subject to exclusion under [section] 352. . . . In other words, just because

31

something's admissible doesn't mean necessarily it all comes in if, you know, we get into a point of cumulativeness on an issue or something like that."

Sullivan's argument on appeal is that even though "some gang evidence was admissible to explain the rivalry . . . between Westmobb and Big Block[,] . . . the evidence of other firearms, other murders, and gang members in the courtroom had little or no relevance" or "[wa]s cumulative." But as to the evidence of other guns and other murders, Sullivan's brief acknowledges that the reason this evidence was admitted was "[b]ecause the gang charges were not bifurcated," and his counsel never moved for bifurcation.

Further, Sullivan does not maintain that, at trial, he ever objected to the evidence he now challenges on the grounds it was cumulative or that its undue prejudicial effect outweighed any probative value. Because Evidence Code section 353, subdivision (a), requires that "the specific ground of the objection" be "timely" and "clear[ly]" made, we may not reverse his convictions based on Sullivan's newly raised arguments. (See *People v. Partida* (2005) 37 Cal.4th 428, 433-435; *see also People v. Holloway* (2004) 33 Cal.4th 96, 133 ["A tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself."]).

**b.**

Sullivan argues in the alternative that even if his counsel forfeited the issue by failure to object, the failure constituted ineffective assistance of counsel. As our Supreme Court has observed, ineffective assistance of counsel claims rarely succeed on direct appeal because the appellate record seldom reveals trial counsel's reasoning for an action or omission. (See *People v. Mickel* (2016) 2 Cal. 5th 181, 198 (*Mickel*).)

We are unpersuaded by Sullivan's contention that, because counsel objected to all gang evidence at the outset, there could have been no reasonable explanation for failing to move for bifurcation or failing to object to admission of particular gang evidence at trial. As the jury was instructed and trial counsel acknowledged during closing arguments, the gang evidence was relevant not only to the gang participation and enhancement charges, but also to the question of motive. Trial counsel may have reasoned that because the evidence relevant to the gang-related charges was so interwoven with the evidence relevant to the remaining substantive charges that any attempt to bifurcate would have been unsuccessful at keeping the gang evidence out.

Moreover, trial counsel made use of the evidence. She asserted during closing argument that the jury was "bombarded with all of this gang testimony" not only because it was relevant to the prosecution's case on the gang participation and enhancement charges but also because "[i]t's to give you a real picture. You should have a full picture of everyone involved. [¶] You can't evaluate the evidence unless you have a full picture." Trial counsel affirmatively relied on the "full picture" of interactions between the gang members, including the ongoing feud between Big Block and Westmobb and specific incidents of violence between the two gangs. For example, she argued that two other Big Block members, Anthony Brown and Michael Higginbotham, were more likely suspects than Sullivan because Westmobb members tried to shoot them the day after Rice was killed. Sullivan's counsel also pointed to an incident in which armed Westmobb members came to Hunter's house—but not Sullivan's—to try to exact retribution just hours after Rice was killed. She pointed to graffiti that suggested Westmobb planned to kill Hunter. She highlighted other Big Block or Westmobb members who had been "murdered" or "killed" since Rice's death. Trial counsel argued that no one came to Sullivan's house or tried to threaten or kill him after Rice was shot because Westmobb

33

members who witnessed the shooting knew that Sullivan was not Rice's killer.  For the jury to understand these exculpatory arguments, Sullivan's counsel told the jury, "you have to know, from my point of view," who the "player[s]" in Westmobb were, and their relationships with one another, as well as who the main players in Big Block were.

Because Sullivan has failed to show affirmative evidence that his trial counsel could have had "no rational tactical purpose" for declining to move for bifurcation or make further objections to the gang evidence, he is unable to establish that his counsel's performance in this regard was constitutionally deficient.  (See *Mickel*, *supra,* 2 Cal.5th at p. 198.)

**4.**

**Challenge to Admission of Case-Specific Hearsay**

Sullivan next contends that his convictions must be reversed because "much of the gang evidence was case-specific hearsay" admitted in violation of his rights under the federal Constitution's Confrontation Clause.  (*See Crawford*, *supra*, 541 U.S. 36; *Sanchez*, *supra*, 63 Cal.4th 665.)  In his abbreviated briefing on this issue, the only evidence that he specifically identifies as hearsay is testimony by Manning that "certain gang members were 'murdered' and others were in prison facing charges of murder or other violent crimes."  However, Sullivan does not reference any specific out-of-court statements or provide any analysis or authority for the proposition that the fact a person is facing criminal charges or has died is an out-of-court statement amounting to hearsay.  He has therefore forfeited the issue.  (*See* Cal. Rules of Court, rule 8.204(a)(1)(B).)

34

**5.**

## Challenges to Admission of Rap Lyrics

Sullivan challenges the admission of several videos, most of which show Big Block members performing raps, as well as rap lyrics recovered from his cell phone. Sullivan asserts that the trial court abused its discretion in admitting the videos and lyrics and the error prejudiced his trial. We conclude that the admission of five rap videos and lyrics from Sullivan's phone was harmless error under Evidence Code section 352.

**a.**

Before assessing the parties' contentions, we briefly describe the videos and lyrics challenged by Sullivan.

"*Sick Crew ft. NBA*" (Exhibit 242). The video opens with a purported news clip discussing the rivalry between Big Block and Westmobb, stating that "[t]he death toll surges as the gang warfare heats up. [¶] Big Block, the larger of the two groups and with superior firepower, is winning." According to Sergeant Manning, the song is about the "crimes committed by Big Block that led up to the [2000] federal indictment" against the gang. The lyrics discuss drug sales, the federal indictment against Big Block, and firearm charges. The lyrics include "[f][*]ck the boys in blue," referring to the police, as well as a reference to "sharp b[*]tches." The video was filmed in Big Block territory, and several Big Block members are seen rapping, dancing, or congregating in this video, including Sullivan, although he does not rap in it. Firearms and ammunition are visible in the video.

"*Money on Yo Head -- Lil Blood*" (Exhibit 242). The video, which was shot in Big Block's gang territory, starts with two men discussing a kidnapping, and it shows a person tied up in a trunk as well as a blindfolded woman and child who huddle together

35

while a rapper points two guns at them.  The video includes the repeated refrain:

> "My gang is shootin' shots all day we call it trippin'
>
> Money on ya head, your sister will come up missin'
>
> Money on ya head, your daughter will come up missin'
>
> Snatch that b[*]tch up in broad day we caught him slippin'"

The song refers to "stabbing," "choppin," "shots," "guns," a "trigger finger . . . itchin'" and "blow[ing] out your brain."  Sullivan appears in the video along with other Big Block members.  While Sullivan appears in the center of the camera shot, a rapper says " 'Lee [is] trying to catch a body.' "  Manning testified that this lyric indicated that Sullivan was "trying to kill somebody."

*"Off Safety - Taliban Shady"* (Exhibit 242).  This video, in which Sullivan does not appear, features rapping by Rashad Preston, a Big Block member whose rap name is "Taliban Shady."  Individuals are seen pointing handguns at the camera, and some of the young men depicted in the video simulate shooting with their hands.  Groups of young men are rapping, dancing, standing around, smoking, and throwing hand signs, and flashing cash.  The lyrics discuss keeping the narrator's gun with the safety off—ready to fire, warn people not to "f[*]ck around and make the hit list," and threaten to kill people and put them on a memorial t-shirt.  Several of the young men in the video are Big Block members.  In one scene, the words "Free Smoove" are visible as graffiti; the words refer to releasing co-defendant Hunter.

*"Why You Hatin - Taliban Shady"* (Exhibit 242).  The video opens with a young man saying "free D-Smoov" and "free Lee," referring to Hunter and Sullivan, neither of whom appear in the video.  In the video, Taliban Shady raps, smokes, flashes cash, and repeatedly simulates shooting a gun with his hands.  The

lyrics discuss sliding through a block spraying bullets; a Glock that could "throw a ni[**]a [and] put him back to sleep"; and flipping cars, burning, and charred flesh.

*Untitled Video* (Exhibit 250).  Unlike the foregoing videos, which appear to be professionally produced, this informal video appears to have been shot with a cell phone camera.  Several young men, one of whom is Sullivan, hang out on the street, in Big Block territory, and take turns improvising raps, laughing, and dancing.  As Manning testified, the video "[l]ooks like it[] [was filmed] just when they're hanging out, [and] they made a freestyle . . . rap video."  No weapons are visible, but the raps reference guns and violence: "AK's . . . spittin' like camels" and "clearing blocks"; "[y]oung ni[**]as pullin' trigger"; and "spraying hella rounds" and "put[ting] you in the ground."  Sullivan's rap includes references to "getting[] bitches," "shootin,'" "holsters," putting people on "homicide posters," and "jump[ing] out with the chop" (assault rifle).  In addition, Sullivan raps: "Imma go off the top of the dome" and "[h]it his ass with the chrome," which Manning testified meant Sullivan was going to "shoot off the top of someone's head" and hit someone with a gun or bullet.  Laughter can be heard throughout the video, including while Sullivan is rapping.

*"Public Announcement 3"* (Exhibit 240). This informal video depicts Rice, the murder victim, walking around near his home, showing where he can be found, and inviting rival gang members to come after him.  Rice posted the video to his Facebook account in March 2012.

*Lyrics from Sullivan's Phone* (Exhibit 251).  The lyrics recovered from Sullivan's phone contain references to gangs and "[B]ig [B]lock" specifically; AK-47s, Glocks, and other firearms and ammunition; and murder, violence, and other criminal activities.  For example, the very first lines in Exhibit 251 are "Gang affiated might get me indicted/ [¶] . . . Selln dope shoot

guns dat get me excited." The lyrics continue: "Ride for my ni[**]azYea I'm my brother's keeper/ [¶] . . . Walkin ya hood snatchn ni[**]a like d reaper / [¶] . . . Rockin wid dat swweeper / [¶] Dat ak 47." These lyrics referred to getting indicted for being gang affiliated, shooting people, and using a "street sweeper" or assault rifle to kill people.

Other lyrics include: "if its beef me n yungis creep Murder u /mm I use to run wid murder crew." The jury heard testimony that these lines meant "if '[i]t's a beef, me and my youngins creep" and will "kill you" and that the narrator was affiliated with the " 'M and M' ": " 'money and murder' " or " 'murder crew,' " a clique within Big Block. Additional lyrics referred to " 'thuggin' " or being a criminal, clutching a gun, using a " 'big chop[] ' " or assault weapon, and being a " 'solder (sic) of Harbor Road,' " or a soldier in a gang war.[4] In addition, the lyrics included: " 'Fuk [doing] a drive by [shooting], tip toe when I'm clappin,' " meaning "sneak up while I'm shooting."

In another set of lines that Manning testified was "very important," the lyrics read: "45 WID 30 ON EXTENDO JUMPING OUT D RENTAL@/ . . . [¶] that's way a Ni[**]a get murdah in dese streets quick." Manning testified that these lines referred to " 'jumping out' " of a rental car with a .45-caliber gun outfitted with a 30-round magazine.

b.

As an initial matter, we must address the People's argument that Sullivan forfeited his objections to some of the rap videos due to failure to object at trial.

At trial, Sullivan objected to four of the six videos he challenges on appeal, and he objected to the admission of the rap lyrics found on his phone. As the People acknowledge, Sullivan

---

[4] Because it is in Big Block territory, "Harbor Road" refers to Big Block.

objected on Evidence Code section 352 grounds to the four videos contained in Exhibit 242: "Sick Crew ft. NBA," "Money on Yo Head -- Lil Blood," "Off Safety - Taliban Shady," and *"*Why You Hatin - Taliban Shady.*"* Sullivan also objected on Evidence Code section 352 grounds to the rap lyrics from his phone (Exhibit 251).

Sullivan did not, however, object to Rice's "Public Announcement 3" video in Exhibit 240, or to the untitled video in Exhibit 250. His failure to object forfeits his challenge on appeal unless an objection would have been futile. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1190 ["We typically excuse failures to raise futile objections."].)

Although we agree with the People that Sullivan forfeited his objection to the "Public Announcement 3" video, we conclude that he did not forfeit his challenge to the video in Exhibit 250 because an objection likely would have been futile. (See *People v. Gomez* (2018) 6 Cal.5th 243, 286-287 [concluding that evidentiary objections were futile where the trial court had already rejected an Evidence Code section 352 objection to the testimony and the record suggested the trial court would have overruled further objections]; see also, e.g., *People v. Navarro* (2021) 12 Cal.5th 285, 332-333; *People v. Nieves* (2021) 11 Cal.5th 404, 494.) "Public Announcement 3" was the first of the videos introduced by the prosecution, and there was no basis for concluding at that point that an objection would have been ineffective. By the time the prosecution sought to introduce Exhibit 250, however, the trial court had already admitted four other rap videos over Sullivan's Evidence Code section 352 objection.

We will therefore consider Sullivan's challenge to the five rap videos in Exhibits 242 and 250 and to the rap lyrics in Exhibit 251.

**c.**

Sullivan relies in part on Assembly Bill No. 2799 (2021-2022 Reg. Sess.) (AB 2799), which added section 352.2 to the Evidence Code and took effect on January 1, 2023, while his appeal was pending.  (Stats. 2022, ch. 973, § 2.)  The statute provides that when a party seeks to introduce a form of creative expression such as rap lyrics into evidence, the court, in addition to performing an Evidence Code section 352 analysis, must consider that: "(1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evidence Code] Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (Evid. Code, § 352.2, subd. (a).)

"In enacting the provision, the Legislature made the following findings and declarations, showing that a particular concern was the possible unfair prejudice stemming from the admission of rap lyrics: [¶] '(a) Existing precedent allows artists' creative expression to be admitted as evidence in criminal proceedings without a sufficiently robust inquiry into whether such evidence introduces bias or prejudice into the proceedings. In particular, a substantial body of research shows a significant risk of unfair prejudice when rap lyrics are introduced into evidence. [Citations.] [¶] (b) It is the intent of this Legislature to provide a framework by which courts can ensure that . . . an accused person's creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as

40

character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice.' " (*People v. Ramos* (2023) 90 Cal.App.5th 578, 591–592, review granted July 12, 2023, S280073 (*Ramos*).)

There is a split in authority over the retroactive application of Evidence Code section 352.2 to nonfinal convictions. Our Supreme Court is currently considering the issue. (*People v. Venable* (2023) 88 Cal.App.5th 445, 448 [Evid. Code, § 352.2 is retroactive], review granted May 17, 2023, S279081 (*Venable*); *Ramos, supra*, 90 Cal.App.5th at p. 596 [Evid. Code, § 352.2 is not retroactive]; *People v. Slaton* (2023) 95 Cal.App.5th 363, 376 [same], review granted Nov. 15, 2023, S282047 (*Slaton*); *see also People v. Bankston*, S044739 [automatic appeal raising the retroactivity of Evid. Code, § 352.2].) We need not resolve this disagreement, however, in light of our analysis of Sullivan's Evidence Code section 352 challenge, to which we now turn. (*See Hin, supra,* 17 Cal.5th at p. 471.)

**d.**

Sullivan contends that the trial court abused its discretion under Evidence Code section 352 in admitting the rap videos and lyrics because their probative value was outweighed by their prejudicial effect, particularly given that the prosecution presented abundant alternative evidence that he was affiliated with Big Block and therefore had a motive to kill Rice. At oral argument, the People conceded that at least some of the rap evidence should not have been admitted. We agree that the court

41

erred by admitting the videos and lyrics, but we conclude the error was harmless.

**i.**

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "The 'prejudice' which section 352 seeks to avoid is that which ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues.*' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 275, original italics.)

Our Supreme Court recently cautioned that rap lyrics have " 'minimal probative value' " as evidence of their literal truth. (*Hin*, *supra,* 17 Cal.5th at p. 477, quoting *People v. Coneal* (2019) 41 Cal.App.5th 951, 953 (*Coneal*).) Like other musical lyrics, rap lyrics are a form of " ' "figurative expression[]" ' " and " ' "are not intended to be and should not be read literally on their face." ' " (*Hin*, at p. 477, quoting *In re George T.* (2004) 33 Cal.4th 620, 636; see also *People v. Melendez* (2016) 2 Cal.5th 1, 23 (*Melendez*).) The probative value of lyrics as a statement of fact may be increased with corroboration from other evidence or when the lyrics are written close in time to the crime at issue or bear a "sufficient level of similarity to the charged crime." (*Coneal*, at p. 969; see also *Melendez*, at p. 23 [affirming exclusion of handwritten rap lyrics found in co-defendant's jail cell appearing to take responsibility for the charged crime, where no foundation was laid indicating the co-defendant had authored the lyrics and, although the lyrics bore some similarity to the crime, "[n]o reason appears to assume they relate actual events"].) But absent a meaningful basis for concluding that particular lyrics bear a relationship to real-life events, rap lyrics—like those from any

42

other musical genre—may be purely fictional. (*Coneal*, at pp. 968-969; see also *Hin*, at p. 478.)

Apart from its minimal probative value, gang-related rap music may be especially prejudicial due to its " 'violent, inflammatory lyrics.' " (*Hin*, *supra*, 17 Cal.5th at p. 477, quoting *Coneal*, *supra*, 41 Cal.App.5th at p. 954.) The use of rap lyrics in a criminal prosecution relies on racist stereotypes concerning Black men and other people of color. (*Hin*, at p. 477.) It also invites the possibility that the jury's decisionmaking may be infected by racial bias. (*Ibid*.)

Sullivan relies on *Coneal*, which was decided a couple months after the verdict in this case. *Coneal* held that the admission of the rap videos at issue in that case was an abuse of discretion because the videos were cumulative of other evidence of the defendant's gang membership and related issues. (*Coneal*, *supra*, 41 Cal.App.5th at pp. 966-968.) For the purpose of establishing the defendant's gang membership, the prosecution introduced numerous screenshots depicting still images from each of the rap videos challenged by the defendant. (*Id*. at p. 966.) The prosecution presented the screenshots, social media images, and other photographs showing the defendant associating with other gang members, making gang hand signs, or wearing gang-associated clothing. (*Ibid*.) There was also evidence that a police detective contacted the defendant while he was at a known gang hangout, and another witness testified that the defendant was a gang member and that he was throwing gang signs in two photographs. (*Ibid*.) *Coneal* held that in light of this substantial evidence of the defendant's gang membership, "the additional probative value of the videos themselves was minimal." (*Ibid*.)

43

The prosecution in *Coneal* contended that the videos were important to demonstrate the rivalry between the defendant's gang and another gang. (*Coneal*, *supra*, 41 Cal.App.5th at p. 967.) But *Coneal* concluded that the videos were cumulative in light of testimony from two expert witnesses about the rivalry between the gangs as well as evidence of other shootings in which members of one gang were shooting at members of the other. (*Ibid*.) Because there was a substantial amount of other evidence serving the same purposes for which the prosecution introduced the rap videos, *Coneal* held that the additional probative value of the videos was minimal. (*Id*. at pp. 967-968.)

Here, as in *Coneal*, the probative value of the rap videos and lyrics was minimal. Notably, the People concede that no foundation was laid for the videos or lyrics, nor do they argue that they were created or written close in time to the charged crimes. Indeed, the subject of the "*Sick Crew ft. NBA*" video was the events that led up to the indictment of Big Block, which occurred in 2001, when Sullivan was no more than 10 years old. The two "Taliban Shady" videos, which call for Hunter and Sullivan to be released from prison, were made after the two were taken into custody.

Although they had some limited relevance to the gang charges and potential motive, the videos and lyrics were cumulative of other evidence on those questions. The prosecution presented evidence of at least seven separate occasions between 2010 and 2013 in which police encountered Sullivan in the company of other Big Block members on gang territory, in some instances with firearms or drugs. Two of the instances in which police documented that Sullivan was in the company of known Big Block members occurred within three weeks before Rice's killing.

The prosecution presented seven stills from the rap videos, four of which included Sullivan. In addition, the record contained

44

a photograph of Sullivan by himself, throwing hand signs, as well as several social media images depicting Sullivan throwing hand signs along with Big Block members.  The record also included numerous photos of Big Block members other than Sullivan associating with each other and/or throwing hand signs.

Police witnesses, including Sergeant Manning, the gang expert, testified that Sullivan is a member of Big Block, a criminal street gang.  Manning also testified that the photographs of Sullivan associating with other Big Block members and throwing gang signs supported the conclusion that he was a gang member because in "throwing those Big Block hand signs, they are letting anyone else who sees those images . . . know . . . what gang they are, and they are doing that directly to show their affiliation to that gang."

The prosecution also presented evidence of the gang rivalry between Big Block and Westmobb and its violent history, including testimony from Manning.  Several hours after Rice was killed, police encountered Terrell Blay, another Westmobb member, aiming an assault rifle at Hunter and Q.H.'s residence, and the next day, multiple shots were fired at a car with two Big Block members, Matthew Higginbotham and Anthony Brown, inside.

We reject the People's argument that the rap videos were not cumulative because they corroborated the defendants' gang membership, the federal indictment of Big Block, the Big Block-Westmobb rivalry, and relatedly, Sullivan's motive to kill Rice.  As discussed above, there was abundant other evidence—including testimony, photographs, and video stills—establishing Sullivan's membership in Big Block, the membership of numerous other Big Block members, and the rivalry with Westmobb.

45

Notably, still images from the videos introduced by the prosecution were probative of Sullivan's association with other Big Block members, but the actual lyrics and music in the videos—painting a picture of rampant violence, cruelty, and misogyny—had little probative value on that question. (See *Hin*, *supra*, 17 Cal.5th at p. 479 [holding that rap lyrics were cumulative as evidence of the defendant's gang membership where the prosecution introduced expert testimony about the defendant's gang membership as well as numerous photographs of the defendant making gang signs, wearing gang colors, and associating with other gang members].) In addition, the federal indictment itself was part of the record and was the subject of testimony by Manning, so the purported news clip included in the beginning of the "Sick Crew ft. NBA" video added little of value. We conclude the probative value of the rap videos and lyrics was minimal in light of the other, less inflammatory evidence.

As in *Coneal*, moreover, the potential prejudice of the rap videos and lyrics was high. "The lyrics casually describe graphic, widespread violence," cruelty, and misogyny. (*Coneal*, *supra*, 41 Cal.App.5th at p. 970; see also *Hin*, *supra*, 17 Cal.5th at p. 480.) The videos refer to gun violence, murder, mayhem, burning cars and flesh, drugs, and kidnapping of women and children. They describe women in offensive terms, threaten to shoot or otherwise harm the listener, and reflect antagonism toward the police. Notably, in one of the videos, a rapper states, " 'Lee trying to catch a body' "—suggesting that Sullivan was trying to murder someone. The lyrics from Sullivan's phone were similarly inflammatory and, in particular, discussed using rental cars and extended magazines in shootings, which the prosecution's gang expert suggested was a "direct reference to this incident." As the People conceded at oral argument, there is no foundation for taking these lyrics literally, as required by *Hin*. (*Hin*, at p. 478.). They also conceded that the videos showed bad conduct and a propensity for violence by gangs.

The videos and lyrics thus "pose[d] a significant danger that the jury will use it as evidence of appellant's violent character and criminal propensity in violation of Evidence Code section 1101, subdivision (a)." (*Coneal, supra,* 41 Cal.App.5th at p. 971; *see also Hin, supra,* 17 Cal.5th at pp. 476-477.) In addition, the videos and lyrics posed a "risk of injecting racial bias into the jury's decisionmaking." (*Hin*, at p. 480.) For these reasons, the potential prejudicial impact of the videos and lyrics substantially outweighed their probative value. The court should have excluded them under Evidence Code section 352.

**ii.**

We next consider whether the erroneous admission of the rap videos and lyrics was harmless. Like the courts in *Hin* and *Coneal,* we conclude the error was harmless.

We apply the state law test for harmless error because there were multiple permissible inferences that could be drawn from the evidence, making it a statutory rather than constitutional issue. (See *Coneal, supra,* 41 Cal.App.5th at p. 972.) The question is " 'whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error.' " (*People v. Watson* (2008) 43 Cal.4th 652, 686; see also *Hin, supra,* 17 Cal.5th at pp. 482-483; *Coneal,* at p. 972.)

To apply this test, we must consider a counterfactual question: what would the jury have done had the court not admitted the rap videos and lyrics? (See *People v. Hendrix* (2022) 13 Cal.5th 933, 948 (*Hendrix*).) To hold an error was prejudicial, the court need not conclude that the error " ' "more likely than not" ' " affected the result. (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.) Instead, an error is prejudicial if there was a " ' "*reasonable chance,* more than an *abstract possibility*," ' "

47

that the error affected the verdict. (*Ibid*., original italics; see also *Hendrix*, at pp. 949-950 [same].) In determining whether the error was prejudicial, our focus is on "what the 'jury is likely to have done,' " and we may neither reinterpret nor reweigh the evidence. (*Hendrix*, at p. 948.)

Here, there is no reasonable chance that the rap evidence made a difference. Because the FBI surveillance video shows the second shooter, the jury would have faced an obvious, focused question regardless of whether the rap evidence came in: Is Sullivan the same short, skinny man in a dark jacket, cap, white t-shirt, and sneakers who is seen, in the video, stepping out of Renesha's rental car and shooting Rice? The jury had two months to observe Sullivan in trial. His appearance had not changed since the shooting. On at least three occasions during the trial, defense counsel asked Sullivan to stand up for the jury, and counsel encouraged "[e]verybody [to] take a look at him." Three police officers who knew Sullivan pointed out things in the video that they believed demonstrated it was him. As the prosecutor told the jury, the video was the "star witness."

In addition to their own eyes, moreover, the jury had copious evidence that placed Sullivan in the video and in the rental car—his phone in the car's center console, his fingerprints on the interior door handle, the glove with his DNA and gunshot residue found in the jacket pocket, the dark jacket itself, which Renesha thought could be Sullivan's. Renesha, Sullivan's girlfriend, said she lent Sullivan (along with the first shooter, Q.H., and Hunter) the car just before the shooting, when Sullivan was wearing a dark baseball cap and jacket, and she picked him up immediately afterwards, when he was wearing just the white t-shirt. In the car, Renesha heard Sullivan brag about killing Rice (known as "Dutch") when he said, " 'I blow Dutch when I smoke.' " Sullivan also matched B.K.'s description of the second

48

shooter, given just days after the shooting, as a 5 foot, 7 inch tall African American man with light skin and a thin build.

To be sure, the defense contested most of this evidence and attacked Renesha's credibility. The defense also presented their own evidence and arguments that it is *not* Sullivan in the surveillance video. But the jury was confronted with a wealth of evidence tying Sullivan to the crime. Renesha's testimony placing Sullivan in the car just minutes before the shooting was corroborated not only by the surveillance video, but also by the physical/forensic evidence, B.K.'s spot-on description of the second shooter, and even Sullivan's distinctive sneakers, as depicted on the video. We see no basis for thinking that, had the rap evidence been excluded, the jury would have drawn different conclusions on whether Renesha was lying or on its views on the physical/forensic evidence and surveillance video corroborating her testimony. Indeed, an uncanny sequence of coincidences and bad luck would be required to explain away the evidence incriminating Sullivan, especially the timing, the presence of Sullivan's DNA on the gloves with the gunshot residue, and the second shooter's height, build, and choice of footwear. The nature and strength of the evidence connecting Sullivan to the crime persuades us that the jury would have convicted him absent the rap evidence.

Notably, none of the jury's 18 notes to the court during deliberations concerned the rap videos or lyrics. (Cf. *People v. Diaz* (2014) 227 Cal.App.4th 362, 384 [explaining that the jury's questions about a video provided "indicia" that the showing of the video was prejudicial].) Three jury questions addressed factual issues specific to Sullivan. The jury asked a question about Renesha's testimony concerning Sullivan and requested the transcript of an interview Sullivan gave to the police. The jury also asked whether Manning had identified Sullivan as the second shooter from the surveillance video at any point prior to

49

his 2019 trial testimony.[5]  These questions further indicate the jury was properly focused on the identity evidence.

Sullivan argues, essentially, that this is a close case on identity—closer than *Hin* and *Coneal*—and therefore the case poses an unreasonable risk that rap videos and lyrics portrayed Sullivan as a violent person who would commit this kind of crime. He points to parts of the prosecutor's closing arguments in which the prosecutor invoked an overall culture of gang violence.  For example, the prosecutor argued, "These defendants . . . were raised their entire lives in this area with this gang violence. . . They were raised in it.  It's part of their identity, and they promoted it over and over and over again."  He also referred to the rap lyric about Sullivan "trying to catch a body."  "Both [Sullivan's] public persona and then his private musings [in the lyrics on his phone] give us the same idea, the same understanding, the same focus on gang violence, violence in general."  We agree that, as in *Coneal* and *Hin*, the prosecutor came " 'dangerously close to advocating the use of the videos as evidence of appellant's violent character.' " (*Hin, supra,* 17 Cal.5th at p. 478, quoting *Coneal, supra*, 41 Cal.App.5th at p. 971.)

We note, however, that the prosecutor referred to rap videos or lyrics in relatively few instances in his lengthy closing and rebuttal arguments, and he generally did so in the context of arguing that the rival gangs' videos help explain the motive for the shooting or that Hunter and Sullivan were "active members" in a criminal gang, "not just guys in the background of music

---

[5] During closing arguments, Sullivan's counsel argued that the first time Manning ever said he could tell that the second shooter in the video was Sullivan was during his testimony at the 2019 trial.  In his testimony, Manning said he was on vacation when the shooting occurred, and that when he reviewed the video "at some later point" after he returned, he recognized the second shooter as Sullivan.

videos." He did not play the videos during closing argument. Instead, the prosecutor focused more on the surveillance video (the "star witness"), Renesha's credibility, the other witness' testimony, and the physical/forensic evidence. Moreover, when arguing that the videos and lyrics were prejudicial, Sullivan does not seriously grapple with the fact that, even if they had been excluded, there would remain a lot of evidence that Sullivan was an active member of a violent criminal gang that killed rival gang members. Had the rap evidence been excluded, we believe the probability of a different outcome for Sullivan was at most an " ' " 'abstract possibility' " ' " rather than a reasonable likelihood. (*Hendrix*, *supra*, 13 Cal.5th at pp. 949-950).

Finally, the fact that the jury acquitted Hunter strongly supports this conclusion. The prosecution argued that Hunter drove the rental car. But the surveillance video did not capture the car's driver, there was no forensic evidence tying Hunter to the rental car, and two eyewitnesses thought the driver was a woman. The prosecution was forced to rely heavily on Renesha's testimony implicating Hunter. Unlike with Sullivan, the prosecution had no evidence, aside from Hunter's phone, to corroborate Renesha's account or to place Hunter in the car at the time of the shooting—no video, no fingerprints, no gunshot residue, no clothing, no DNA evidence. Hunter's acquittal, together with Sullivan's conviction, reinforces our view that the jury based its verdicts on the strength of the identity evidence and would not have reached a different verdict, as to Sullivan, if the rap evidence had been excluded.[6]

---

[6] We do not mean to suggest that the erroneous admission of rap evidence, in violation of Evidence Code section 352, is unlikely to constitute prejudicial error as a general matter. Whether it does will depend on the nature of the evidence in a particular case. Indeed, in a case in which the prosecution's case was comparatively weaker, like Hunter's, the argument for

Our task is not to reweigh the evidence but to determine what the jury would have done absent the rap evidence. (*Hendrix*, *supra*, 13 Cal.5th at p. 948.)  We are unpersuaded that the erroneous admission of the rap videos and lyrics prejudiced the jury's verdict.

## D.     Lay Opinion Testimony

Sullivan further argues that the trial court abused its discretion by allowing several police officers to give their lay opinion identifying Sullivan as the second shooter shown in the surveillance video of the shooting.  (See *People v. Leon* (2015) 61 Cal.4th 569, 600 (*Leon*) [standard of review].)  We disagree.

### 1.

Sullivan moved in limine to preclude any police officer from identifying him based on surveillance footage of the shooting.  He argued that law enforcement identification testimony was unnecessary, unduly prejudicial, and invaded the jury's province.  The court held an Evidence Code section 402 hearing.  Outside the presence of the jury, two San Francisco Police Department officers, Eduard Ochoa and Dave Johnson, testified about watching video of the shooting and their familiarity with Sullivan.  Both stated they could identify Sullivan as the man shown in the video who exits the Escape during the shooting.

At the hearing, Ochoa testified that, in the four to five years preceding Sullivan's arrest in this case, he had arrested Sullivan twice, spoken to him approximately 25 times, and had seen him "well over 500 times" while either on patrol or on social media.  Ochoa testified he recognized Sullivan based on the hair, body type, shoes, and walking gait of the man shown in the video. Johnson estimated he had seen Sullivan over 100 times and "interacted" with him approximately 50 times (including during

prejudicial error from inflammatory rap videos and similar propensity evidence would be much stronger.

52

execution of a search warrant and two arrests) before June 24, 2013. When Johnson viewed the video, he recognized Sullivan based on the second shooter's face, specifically their nose and lips.

The prosecutor argued the officers' testimony was helpful to the jury (and therefore admissible) because the surveillance footage itself was not clear. The court agreed and denied Sullivan's motion in limine but stated the officers' testimony could be sanitized to exclude references to prior arrests or search warrants.

Both Ochoa and Johnson testified similarly before the jury—that they recognized Sullivan as the man who was shown on the surveillance video exiting the rear passenger side of the Escape. Ochoa said he recognized Sullivan from "the [body type], the walk, the stance, as well as the height." Johnson testified that he recognized the man in the black sweatshirt's nose and lips, as well as his mannerisms, as being Sullivan's.

The prosecution's gang expert, Sergeant Manning, testified on direct exam that, in his role on the gang task force, he was responsible for monitoring FBI surveillance video from the scene of the shooting. However, on June 24, 2013, Manning had not been watching the footage live because he was on vacation. Manning also testified that he knew Sullivan—with whom he had "dozens of conversations and contacts" since 2008.

When Manning's direct testimony resumed, after defense witnesses Befford and Jones were called out of order, Manning testified, over defense counsel's objection, that he viewed the surveillance video footage when he returned from vacation and had no doubt that Sullivan was the man who exited the Ford Escape during the shooting. The court allowed Manning's testimony.

**2.**

Sullivan is wrong that the officers' identification testimony should have been excluded because his appearance had not changed since the shooting and the officers were in no better position than the jury to make an identification from the video.

"A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.) '[T]he identity of a person is a proper subject of nonexpert opinion.' " (*Leon, supra,* 61 Cal.4th at p. 601.) Our supreme court and courts of appeal have upheld the admission of similar testimony identifying a suspect in surveillance video footage or photographs by officers who were not direct witnesses to the crime. (See *Leon,* at p. 601; *People v. Mixon* (1982) 129 Cal.App.3d 118, 130-131; *People v. Perry* (1976) 60 Cal.App.3d 608, 613.) In short, it is proper for an officer to provide a lay identification opinion from surveillance photos or video if (1) the witness testifies based on personal knowledge of the defendant's appearance; and (2) the testimony aids the trier of fact in determining the identity issue *because the photo or video is not clear* or because the defendant has changed his appearance before trial. (*Leon,* at pp. 600-601; *Mixon,* at pp. 128-132; *Perry,* at p. 613.)

Ochoa, Johnson, and Manning all had personal knowledge of Sullivan's appearance from their interactions before the video was captured. The officers' testimony also aided the jury because the images captured by the surveillance video were undisputedly not clear. (*Mixon, supra,* 129 Cal.App.3d at p. 131.) True, Sullivan's appearance had not changed since the time of the shooting. But this went to the weight, not the admissibility, of the officers' testimony. (*Leon, supra,* 61 Cal.4th at p. 601.) The same goes for the fact that 15 to 20 other officers were unable to make an identification from the video.

54

We acknowledge that lay opinion identification from law enforcement officers carries an inherent risk of prejudice—by presenting a defendant as the subject of prior police scrutiny. (*People v. Larkins* (2011) 199 Cal.App.4th 1059, 1067; *Mixon, supra*, 129 Cal.App.3d at pp. 129, 132-133; but see *Leon, supra*, 61 Cal.4th at pp. 600-601 [upholding admission of officer's identification testimony without any expression of concern regarding prejudice].) However, that does not mean that prejudice outweighed the probative value of Ochoa's and Johnson's identification testimony—especially where identity was the key disputed issue.

This was a gang case, where Ochoa, Johnson, *and several other officers* testified extensively regarding crimes committed by other Big Block members, Sullivan's and Hunter's police contacts and possession of firearms, and congregation with each other and other Big Block members. Accordingly, no additional adverse inference was likely to be drawn from Ochoa's or Johnson's foundational testimony regarding their contacts with Sullivan.

Manning's identification testimony may present a closer question. As Sullivan points out, Manning testified in a dual capacity. He was deemed an expert on criminal street gangs—and provided expert opinion testimony in that role—and provided lay opinion as a percipient witness. Thus, there was some danger that the jury would be confused as to the nature of Manning's testimony or give his identification unwarranted authority. (See *People v. Rouston* (2024) 99 Cal.App.5th 997, 1011 ["[w]hen an expert testifies to conclusions that a lay jury can draw, it suggests ' " 'that the judge and jury may shift responsibility for decision to the witnesses' " ' "]; *id.* at p. 1015; *United States v. Reyes Vera* (9th Cir. 2014) 770 F.3d 1232, 1241-

1243 [noting problematic nature of dual capacity testimony].) However, Sullivan did not raise an Evidence Code section 352 objection to Manning's identification testimony.

Moreover, Sullivan's vague and conclusory arguments are insufficient to meet his burden to show prejudice. (See *People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) The trial court instructed the jury, "you heard testimony from witnesses about the identity of people depicted in photos and videos admitted into evidence. Some of these witnesses were police officers. *Although some of them testified as experts on other subjects, they were not testifying as experts when they gave their opinions about the identity of people depicted in photos and videos.* Police officers should not be presumed to have any greater or lesser ability than any other witnesses to identify persons depicted in photos or videos." (Italics added.) And the jury had the opportunity to examine the video evidence itself to make an independent determination on identity. (See *Leon, supra*, 61 Cal.4th at p. 601 ["because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant"].) The jury was also instructed on evaluation of lay and expert opinion and told that they were free to disregard any opinion if they found it "unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM Nos. 332-333.) We presume the jury followed these instructions. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83.)

**3.**

Sullivan also contends that the trial court "allowed inadmissible hearsay testimony" and vouching by Sergeant Cagney regarding Ochoa's and Johnson's identifications. He also argues Sergeant Cagney impermissibly implied that no other officer identified someone *other than* Sullivan as the second shooter.

56

In particular, Sergeant Cagney testified, *without objection*, that he was told by another officer that Ochoa and Johnson (who he had not previously known) were "really the go-to authorities" about the current "players" and "personalities" in Bayview/Hunters Point.  Sullivan maintains that this was hearsay and improper vouching.

On cross-examination, Cagney said he showed the surveillance footage to 15 to 20 other officers.  None of those officers "gave [him] a definitive [identification that] they were willing . . . to testify to . . . in court."  On redirect, the prosecutor asked Cagney, "[d]id anyone else ever identify that second shooter as anyone other than [Sullivan]?"  Cagney responded, "No."  The prosecutor followed up, "did anyone ever tell you that is not [Sullivan on the video]?"  Cagney responded, "No.  No police officer has ever told me that."  Sullivan claims the latter inquiries elicited hearsay or were irrelevant.

Sullivan acknowledges that he failed to raise any such objections to these portions of Cagney's testimony in the trial court.  Accordingly, he forfeited the issues he raises on appeal.  (Evid. Code, § 353, subd. (a); *People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)  We disagree with Sullivan that defense counsel's omission amounted to ineffective assistance of counsel.

Here, contrary to Sullivan's assertion, we cannot conclude that the record "affirmatively discloses counsel had no rational tactical purpose" for failing to object or that "there simply could be no satisfactory explanation."  (*Mai*, *supra*, 57 Cal.4th at p. 1009.)  First, "[b]ecause the decision whether to object is inherently tactical, the failure to object to evidence will seldom establish incompetence."  (*People v. Freeman* (1994) 8 Cal.4th 450, 490-491.)  The Attorney General argues that Cagney's "go-to authorities" statement

57

would have been admissible (over objection) not for the truth of the matter asserted but to explain why Cagney asked the two officers to watch the video. Thus, trial counsel could have reasonably concluded that he would be unable to exclude the statement altogether and decided not to object so as not to draw further attention to the statement.

Sullivan also argues that his counsel was ineffective for failing to object when Sergeant Cagney testified that none of the other officers he spoke to identified someone else or otherwise ruled Sullivan out as the second shooter. Sullivan maintains that the officers' silence was either improper vouching or an adoptive admission of Ochoa's and Johnson's identifications. His ineffective assistance claim lacks merit because even if we assume (without deciding) that counsel's failure to object to Cagney's testimony was constitutionally deficient in either instance, Sullivan's wholly conclusory prejudice argument nonetheless fails to persuade us that, but for the error, there is any reasonable probability of a different outcome despite the admissibility of Ochoa's, Johnson's, and Manning's identification testimony. (*Strickland, supra,* 466 U.S. at p. 694.) Sullivan fails to carry his burden on appeal. (*Mai, supra,* 57 Cal.4th at p. 1009.)

**4.**

Finally, Sullivan argues that trial counsel was ineffective for failing to elicit clear testimony from Sergeant Manning that he had not reported being able to identify Sullivan as the second shooter at any time before trial.

There is no dispute that Sergeant Manning never wrote a report documenting his identification of Sullivan. But even if we assume (without deciding) that counsel's failure to elicit clearer testimony to that effect was constitutionally deficient, Sullivan's wholly conclusory prejudice argument nonetheless fails to persuade us that, but for the error, there is a reasonable

58

probability of a different outcome (given the other admissible officer identifications and the trial court's instructions). (*Strickland, supra,* 466 U.S. at p. 694.) Sullivan again fails to carry his burden of establishing a meritorious ineffective assistance of counsel claim on direct appeal.

## E.    Social Media Communications

Sullivan argues that the trial court violated his Sixth and Fourteenth Amendment rights to due process, confrontation, and a fair trial by allowing a prosecution witness (Renesha) to testify and by refusing to otherwise impose sanctions for social media providers' refusal to produce Renesha's private social media communications. The argument is forfeited and Sullivan does not meet his burden to show counsel was prejudicially ineffective.

### 1.

Before trial, in 2014, Sullivan served subpoenas duces tecum (§ 1326, subd. (b)) on social media providers Facebook, Inc., Instagram, LLC, and Twitter, Inc. (collectively, providers), seeking both public and private communications from Renesha's accounts. To authenticate the requested records, Sullivan's subpoenas also sought the identity of each provider's custodian of records. Providers, none of whom are parties to the criminal case, moved to quash the subpoenas on the ground that the federal Stored Communications Act (Act; 18 U.S.C. § 2701 et seq.) barred them from disclosing the communications without user consent.

In 2018, our Supreme Court addressed the conflict in its opinion in *Facebook, Inc. v. Superior Court* (*Hunter*) (2018) 4 Cal.5th 1245 (*Hunter I*). The *Hunter I* court concluded that the Act's lawful consent exception (18

U.S.C. § 2702(b)(3)) allowed providers to disclose communications configured by a user to be public. (*Hunter I*, at p. 1274.) *Hunter I* also concluded the subpoenas were unenforceable *before trial* under the Act "with respect to communications addressed to specific persons, and other communications that were and have remained configured by the registered user to be restricted." (*Hunter I,* at pp. 1250, 1261, 1276.) Because production of public social media content might obviate the need for additional (private) communications, and because the trial court had not developed an adequate record on alternative ways to obtain such communications, the *Hunter I* court declined to address the defendants' arguments that they would be denied their constitutional rights to due process and a fair trial if providers were not compelled to produce the private communications. The matter was remanded to the trial court. (*Id.* at pp. 1250-1251, 1275-1276.)

On remand, in 2019, the providers produced the responsive public posts to the trial court for in camera review. The trial court construed defendants' subpoenas as trial subpoenas, denied the providers' motions to quash, and ordered the providers to produce responsive private communications to the court for in camera review (the May 1 production order). Approximately two weeks after the May 1 hearing, the court said it had reviewed the public tranche in camera, made minor redactions, and (as agreed between the parties) turned over a copy of the tranche to the prosecution for copying and distribution.

Following the May 1 production order, providers petitioned this court for a writ of mandate. (*Facebook, Inc. v. Superior Court (Hunter)* (2020) 46 Cal.App.5th 109, 117 (*Hunter II),* review granted Jun. 10, 2020, S260846, and review dismissed, Oct. 21, 2020, in light of *Facebook, Inc. v. Superior Court (Touchstone)* (2020) 10 Cal.5th 329, 354, fns. 11, 12 (*Touchstone*).) We initially stayed the production order pending consideration of the petition.

60

After reviewing additional briefing, we dissolved the stay and issued an order to show cause why the relief requested in the petition should not be granted. (*Hunter II,* at p. 117.) Providers nonetheless stated they would not produce private communications, as ordered by the trial court, because they believed compliance would violate the Act. (*Ibid*.)

While the writ was pending in this court and with the stay of the production order lifted, Sullivan's trial proceeded. During jury selection, Sullivan urged the court to hold providers in contempt. Anticipating that the contempt citation would prove ineffective, Sullivan also asked the court for sanctions ranging from dismissal of the entire case to dismissal of the gang allegations, exclusion of Renesha's testimony, and postponing her testimony. The prosecutor agreed that contempt proceedings were called for but otherwise objected to the requested sanctions, arguing that they were "premature and inappropriate" unless the defense could show that the prosecution was somehow responsible. The trial court stated that its focus was on commencing contempt proceedings against the providers and that prejudice to Sullivan could likely be cured by recalling Renesha. The court denied without prejudice Sullivan's request for sanctions.

Sullivan renewed his sanctions request after the trial court held the providers in contempt. Sullivan argued that it was reasonable to believe that Renesha's private communications would be exculpatory because her public posts demonstrated her potential bias. The prosecutor continued to argue that sanctions were not warranted unless Sullivan's counsel could show that the People were responsible for any prejudice caused by the providers' refusal to produce the private content.

61

The trial court believed the undisclosed social media content was "potentially relevant" to the defense and that the providers were "very much in the wrong" for not producing the private content for in camera review. But the court did not believe remedial sanctions were necessary at that point and denied the sanctions requests without prejudice. The court said it wanted to wait to see "whether [Renesha] shows up for trial, what she testifies . . . and . . .what additional evidence is available" for cross-examination.

The issue of sanctions did not surface again until after trial, in Sullivan's new trial motion. In the interim—after the jury convicted Sullivan but before he filed his motion for new trial—we decided in *Hunter II, supra,* 46 Cal.App.5th 109 that the trial court abused its discretion by denying the motion to quash and compelling the providers to produce Renesha's private communications without adequately considering the relevant good cause factors. (*Id.* at pp. 117-118, 121-122.)

We stated that the subpoena *should have been quashed* because there was nothing in the record that demonstrated Sullivan still needed Renesha's private communications following the production of her public content or that Sullivan was unable to obtain such private communications through alternate means. (*Hunter II, supra,* 46 Cal.App.5th at pp. 112, 119-122.) We did not decide whether the Act violated Sullivan's constitutional rights because, had the trial court properly considered all the good cause factors, any constitutional conflict might have been avoided. (*Id.* at pp. 117-118, 121.) We ordered the trial court to vacate its May 1 production order and to grant the providers' motion to quash Sullivan's subpoenas. (*Id.* at p. 122.) Our Supreme Court, in *Touchstone, supra,* 10 Cal.5th 329, similarly did not reach the constitutional issues. It approved and adopted our approach. (*Id.* at p. 354 & fn. 12; *id.* at pp. 338-339, 356-357, 359.)

62

Notwithstanding the *Touchstone* and *Hunter II* decisions, Sullivan referred to the trial court's now invalidated May 1 ruling, in seeking a new trial, and argued that the trial court should have fashioned some sort of remedy after providers refused to produce Renesha's private content.

The People opposed the motion for new trial, arguing that Sullivan's claims regarding his subpoenas were "moot" because, in *Hunter II*, we had vacated the trial court's May 1 production order and instructed the trial court to grant the motion to quash. (*Hunter II, supra*, 46 Cal.App.5th at p. 122.) The prosecutor also argued that any error was harmless because Sullivan had not made an offer of proof regarding the substance of Renesha's private communications. The trial court denied Sullivan's new trial motion, stating (with respect to the social media related arguments) that "no error" was shown.

**2.**

We agree with the Attorney General that Sullivan forfeited review of this issue by failing to renew his request for remedial measures after the trial court denied his motion *without prejudice* but before the motion for new trial. (See *People v. Mills* (2010) 48 Cal.4th 158, 170 ["[a]s a general matter, when a trial court denies a motion without prejudice the matter is forfeited if not renewed"].)

**3.**

We also reject Sullivan's alternative argument—that his trial counsel was ineffective for failing to renew the sanction request to remedy the providers' purported discovery misconduct.

A claim of ineffective assistance of counsel based on failure to make a motion must demonstrate not only the

63

absence of a tactical reason for the omission, but also that the motion would have been meritorious. (*People v. Mattson* (1990) 50 Cal.3d 826, 876.)

Sullivan cannot meet this burden. The record on appeal is silent and does not directly disclose why Sullivan's trial counsel did not renew his request for sanctions at the time Renesha was granted immunity. And Sullivan makes no attempt to persuade us that, had his sanctions request been reasserted, it had merit at that juncture.

Our independent research shows there is authority permitting sanctions for third-party discovery abuses in criminal cases. (See *Hunter I, supra*, 4 Cal.5th at p. 1291, fn. 47; *Kling v. Superior Court* (2010) 50 Cal.4th 1068, 1078 ["a third party's refusal to produce documents requested by the defense can potentially result in sanctions being applied against the People"], disapproved on other grounds by *Touchstone, supra*, 10 Cal.5th at p. 345 & fn. 6; *Department of Corrections v. Superior Court* (1988) 199 Cal.App.3d 1087, 1093; *Dell M. v. Superior Court* (1977) 70 Cal.App.3d 782, 785-787 [*Pitchess* discovery].) However, "sanctions should be tailored to [remedy discovery abuse and not to punish the offending party], should not put the moving party in a better position than he would otherwise have been had he obtained the requested discovery, and should be proportionate to the offending party's misconduct." (*Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1223; cf. § 1054.5, subd. (c) ["The court may prohibit the testimony of a witness . . . only if all other sanctions have been exhausted. The court shall not dismiss a charge . . . unless required to do so by the Constitution of the United States.].)

There is no basis for imposing sanctions against the prosecution in the circumstances before us. First, Sullivan's apparent assumption that the providers engaged in discovery misconduct is weak to unsupported. After all, the trial court's

64

May 1 production order was ultimately *invalidated* because Sullivan failed to establish good cause for obtaining the private social media communications from the providers. (*Hunter II, supra,* 46 Cal.App.5th at pp. 117-118, 121-122.)

Second, most of the remedies Sullivan initially sought—dismissal of all charges, dismissal of the gang allegations, or prohibiting Renesha's testimony—would have put him in a far better position than he would otherwise have faced had he obtained additional communications showing Renesha's bias. And the People would have been gravely punished despite having no constitutional obligation to seek out, obtain from third parties, and disclose all evidence that might be beneficial to the defense. (See *People v. Baugh* (2024) 107 Cal.App.5th 739, 747, 751 [rejecting argument that prosecution has constitutional duty to assist defense in obtaining possible impeachment evidence from victim or third party].)

Sullivan's theory was that Renesha falsely implicated him in the shooting to avoid her own culpability and because she was in a jealous rage after discovering Sullivan's girlfriend. As Sullivan acknowledges, his trial counsel extensively cross-examined Renesha with numerous public social media posts in which she appeared to threaten others with violence and guns. Renesha authenticated these posts and acknowledged that she threatened Sullivan's girlfriend in August 2013. In these circumstances, it was not irrational for defense counsel to forego renewing Sullivan's request for remedial sanctions. Counsel is not ineffective for failing to make a motion that counsel "reasonably determine[d] would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.)

Sullivan cannot show that the trial court would have granted his request to exclude Renesha's testimony (or

dismiss all or some charges) had it been renewed.  Thus, Sullivan has not met his burden to demonstrate that defense counsel rendered prejudicial ineffective assistance.

## F.    Anonymous Tip

Sullivan contends that his constitutional rights to due process and confrontation were violated when the trial court admitted the contents of an anonymous tip, which identified him as a suspect.  We disagree.

### 1.

Sergeant Cagney testified on direct examination that, several days after the shooting, he received the following anonymous tip: " 'You better arrest Lee Sullivan.  . . . He shot that boy.' "  Cagney reported he received the tip initially from a San Francisco Police Department Lieutenant who, in turn, had received the tip from someone in the "Police Service Aid."[7]  Both defendants objected that Cagney's testimony therefore constituted multiple levels of hearsay.  They did not object on any other ground.

After the prosecutor explained the tip was offered only for the nonhearsay purpose of explaining the subsequent investigation, which had been attacked by the defense, the trial court overruled the defense objection.  The court instructed the jurors that the tip was "not being offered for the truth, but for what [Cagney] was told, just for its effect on him, his state of mind, how he went forward in his investigation, why he did the things that he did."  Cagney then testified that the tip led him to

---

[7] Cagney later testified, in response to a juror question, that the police department publishes "an anonymous phone number" where you can call and leave anonymous information, which an officer records.

instruct another officer to show Renesha a photo lineup containing a photo of Sullivan.

At the close of evidence, the trial court further instructed the jury: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

## 2.

Sullivan asserts on appeal that his confrontation rights were violated by admission of the tip because he was unable to cross-examine the anonymous informant and officers who passed the tip to Cagney. However, Sullivan acknowledges that he failed to object on constitutional, relevance, or undue prejudice (Evid. Code, § 352) grounds. Thus, as an initial matter, we conclude that only the hearsay objection was preserved for appeal. (Evid. Code, § 353, subd. (a); *People v. Demetrulias* (2006) 39 Cal.4th 1, 19-21.)

We also summarily reject Sullivan's ineffective assistance claim based on counsel's failure to press a confrontation clause objection. As Sullivan acknowledges, even if his trial counsel had lodged a confrontation clause objection, the question would still come down to whether Cagney's testimony was admissible for nonhearsay purposes. (See *People v. Hopson* (2017) 3 Cal.5th 424, 432.)[8]

And Sullivan's contrary arguments notwithstanding, Cagney's testimony regarding the anonymous tip was

[8] Sullivan also suggests (in conclusory fashion) that defense counsel should have objected that admission of the tip's content violated Evidence Code section 352 because its prejudice outweighed its probative value. We need not address this point because Sullivan forfeited it by failing to articulate a reasoned argument supported by meaningful analysis and citations to authority. (See *People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1364, fn. 6.)

67

admitted only for the nonhearsay purpose of explaining how his investigation proceeded—specifically why Sullivan's photos were included in the lineup shown to Renesha. (See Evid. Code, § 1200; *People v. Ervine* (2009) 47 Cal.4th 745, 774-776 (*Ervine*).) Even if Sergeant Cagney treated the anonymous tip as true, as Sullivan claims, that does not render the information inadmissible for that limited purpose. (See *People v. Bell* (2019) 7 Cal.5th 70, 100 [out of court statement to detective admissible to show its effect and explain why, having believed the statement true, the detective did not pursue forensic testing].) Moreover, the court properly and timely instructed the jury that the statement was not being admitted as proof that Sullivan was the second shooter but, instead, to explain Cagney's subsequent investigative action, and that it could not be considered for other purposes. We presume that the jury faithfully followed the court's limiting instruction. (*Ervine*, at p. 776.)

Sullivan points out correctly that limiting instructions have been deemed insufficient to protect defendants in *other* contexts (See *Sanchez, supra,* 63 Cal.4th 665; *Bruton v. United States* (1968) 391 U.S. 123). Neither applies here. Cagney was not testifying as an expert (*Sanchez*), and nothing in the record suggests the anonymous tip came from Sullivan's nontestifying codefendant, Hunter (*Bruton*). Sullivan offers no rationale for extending either the *Sanchez* or *Bruton* exceptions to this case.

Finally, we reject Sullivan's suggestion that the prosecutor's isolated reference to the anonymous tip in his closing argument undermined the court's limiting instruction. (See *Ervine*, *supra*, 47 Cal.4th at p. 776.) Sullivan never objected to this in the trial court, so any prosecutorial misconduct argument is forfeited. (§ 1259.) Moreover, as Sullivan acknowledges, the prosecutor's reference to the anonymous tip came only in the context of explaining Cagney's questioning of Renesha. It was not argued as evidence on the identity issue.

68

## G.  Kill Zone Instruction

Sullivan argues that we must reverse his attempted murder conviction because the trial court's kill zone instruction misstated the law under *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*).  After independently reviewing the question (*People v. Cole* (2004) 33 Cal.4th 1158, 1206), we conclude any error was harmless.

### 1.

Attempted murder requires a specific intent to kill. (*People v. Mumin* (2023) 15 Cal.5th 176, 191 (*Mumin*).) While an intent to kill one person does not transfer to an intent to kill surviving victims, a person can be liable for attempted murder of surviving victims under a theory of concurrent intent, also known as the kill zone doctrine. (*People v. Ibarra* (2024) 106 Cal.App.5th 1070, 1076.)  "[A] kill zone is an area which a defendant intentionally creates in order to kill all those within it to ensure the primary target's death." (*Mumin,* at p. 193.)

Our Supreme Court, in *Canizales,* held that the kill zone theory may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such *that the only reasonable inference is that the defendant intended to create a zone of fatal harm* around the primary target—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death; and (2) the alleged non-primary victim was located within that zone of harm. (*Canizales*, *supra*, 7 Cal.5th at p. 607.)  "Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Ibid*.)

69

*Canizales* also provides examples of circumstances the jury should consider: "the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Canizales, supra,* 7 Cal.5th at p. 607.) The determination "does not turn on the effectiveness or ineffectiveness of the defendant's chosen method of attack." (*Id.* at p. 611.) However, "[e]vidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Id.* at p. 607; accord, *Mumin, supra*, 15 Cal.5th at p. 206.)

**2**.

Our Supreme Court filed its opinion in *Canizales, supra,* 7 Cal.5th 591 about one month before opening statements in this case. The jury was nevertheless instructed, without objection, on the kill zone theory with a version of CALCRIM No. 600 that had not been modified to include reference to the *Canizales* factors.[9] Specifically, the jury was instructed that the prosecution had to satisfy two elements to prove Sullivan guilty of attempted murder: "Number One: The defendant took at least one direct but ineffective step towards killing another person; [¶] And Two: The defendant intended to kill *a person.*" (Italics added.)

The jury was further instructed: "A person may intend to kill a specific victim or victims, and at the same time, intend to kill everyone in a particular *zone of harm*, or kill zone. In order to convict the defendant of the attempted murder of [B.K.] . . . , the People must prove the defendant not only intended to kill [Rice], but also either intended to kill [B.K.] *or attempted to kill everyone within the kill zone.* If you have a reasonable doubt

---

[9] The model instruction has since been revised to account for the *Canizales* factors and clarifications. (See CALCRIM No. 600, as modified September 24, 2019.)

70

whether the defendant intended to kill [Rice], or intended to kill [Rice] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [B.K.]." (Italics added.)

The prosecutor argued in closing that Sullivan, Hunter, and Hunter's brother "drove to West Point and Middle Point Road because they were there to kill their gang rival, [Rice], and they were willing to kill anyone who got in their way."

Addressing the attempted murder count specifically, the prosecutor argued as follows:

"This one's a little more confusing, but the basic idea is because [Sullivan, Hunter, and Hunter's brother] intended, and clearly the target was [Rice], because they're willing to shoot through a person [B.K.] sitting on his lap, it's very clear that we satisfied the kill zone theory here. As long as . . . they intended to kill [Rice] and anyone in that area - - the area is pretty limited from where the shots were fired from - - the defendants are equally guilty of attempted murder."

**3.**

Sullivan argues that his attempted murder conviction should be reversed because the trial court's kill zone instruction did not include *Canizales*'s refinements.

Without discussing their facts or reasoning, Sullivan relies on several cases where courts of appeal have reversed for prejudicial kill zone instructional error, after *Canizales,* and asks us to reach the same result. (See *In re Sambrano* (2022) 79 Cal.App.5th 724, 735-736, disapproved on other grounds by *Mumin, supra,* 15 Cal.5th at p. 209, fn. 11; *In re Lisea* (2022) 73 Cal.App.5th 1041, 1056-1057; *People v. Dominguez* (2021) 66 Cal.App.5th 163, 185-188; *People v. Booker* (2020) 58 Cal.App.5th 482, 500-503; *In re Rayford* (2020) 50 Cal.App.5th 754, 781-784, disapproved on other grounds by *Mumin*, at p. 203; *People v. Mariscal* (2020) 47 Cal.App.5th 129, 139.)[10]

We agree that the instruction given in this case was inadequate because it does not require the jury to find, as is required for application of the kill zone theory, that the defendant intended to kill everyone in the area around the primary target as a means of killing that primary target. (*Canizales, supra,* 7 Cal.5th at p. 607; see *Mumin, supra*, 15 Cal.5th at pp. 209-210; *In re Sambrano, supra*, 79 Cal.App.5th at p. 732.) In fact, the instruction does not define a kill zone in terms of a primary target at all and, accordingly, there was a reasonable likelihood the jury understood the kill zone instruction in a legally impermissible manner. The instruction given here also fails to enumerate the circumstances the jury should consider in assessing a defendant's intent to create a zone of fatal harm and the scope of that zone. (*Canizales, supra*, at pp. 607, 613.) However, we conclude the People have met their

---

[10] Both *Rayford* and *Sambrano* were recently disapproved (in part/on other grounds) by our Supreme Court in *Mumin, supra,* 15 Cal.5th at pages 194-197 and 209, fn. 11.

72

burden to show the error was harmless beyond a reasonable doubt. (See *Mumin,* at p. 207 [standard of review].)

Sullivan argues unpersuasively that the kill zone instruction was prejudicial because "[t]here was no evidence" that he intended to kill B.K., and that the evidence showed B.K.'s injuries were either an unintended or consciously disregarded consequence of the attack on Rice. Here, two shooters fired from about 10 to 15 feet away as B.K. sat in Rice's lap in a bus shelter, which was open to the street but enclosed on the other three sides. At the crime scene, police recovered 23 bullet casings from the semiautomatic gun fired by the second shooter. Both Rice and B.K. were shot multiple times. B.K. suffered gunshot wounds to her forehead, shoulder, and hand. It was undisputed that the shooters intended to kill Rice. And Sullivan's defense to all charges (including the attempted murder of B.K.) was an identity defense.

On this record, the only reasonable inference is that the shooters intended to kill Rice by killing everyone found with a zone of deadly harm that they created around him and that the person *sitting in his lap* was inside that zone. (See *Mumin, supra*, 15 Cal.5th at pp. 191-192; *Canizales, supra*, 7 Cal.5th at p. 607.) The instructional error was harmless beyond a reasonable doubt. The cases cited by Sullivan are factually distinguishable with respect to prejudice.

### H.     Prosecutorial Misconduct

Sullivan argues the prosecutor committed two instances of misconduct during closing argument: (1) by misleadingly suggesting that Hunter's counsel had the ability to call two key witnesses but chose not to and (2) by casting aspersions on Sullivan's counsel and appealing to the jury's passions. After reviewing the issue de novo

(*People v. Uribe* (2011) 199 Cal.App.4th 836, 860), we reject his arguments.

## 1.

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " (*People v. Cole, supra,* 33 Cal.4th at p. 1202.) We review the prosecutor's remarks "in the context of the argument as a whole" (*id.* at p. 1203) to determine whether there is a reasonable likelihood that the jury misconstrued or misapplied them. (*People v. Clair* (1992) 2 Cal.4th 629, 663.)

"Error with respect to prosecutorial misconduct is evaluated under *Chapman v. California* (1967) 386 U.S. 18 [(*Chapman*)] . . . to the extent federal constitutional rights are implicated and *People v. Watson* (1956) 46 Cal.2d 818 . . . if only state law issues were involved." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.)

## 2.

The first instance of alleged prosecutorial misconduct stemmed from testimony Hunter elicited from Sergeant Cagney on cross-examination.

Specifically, Cagney testified that three people (G.H., E.F, and R.B.) told police that a woman was driving the car involved in the shooting. On redirect, Cagney testified that E.F. and R.B. identified Hunter and his younger brother as the shooters.

74

In closing argument, Hunter challenged Renesha's credibility and told jurors to compare her testimony that Hunter was driving with the statements by G.H., E.F., and R.B. that a woman was driving the car at the time of the shooting.

In rebuttal, the prosecutor noted that Hunter's counsel referred to statements by G.H., E.F., and R.B. but that the jurors had not heard directly from E.F. or R.B. The prosecutor argued that the "main reason why" Hunter's counsel had not called either witness was because they had identified Hunter as the second shooter. When the prosecutor added, "[o]f course, [Hunter's counsel] didn't bother to call them," Hunter requested a sidebar.

Sullivan also asked that "he be addressed on prosecutorial misconduct," but the court overruled the objection. Nonetheless, the trial court instructed the jury that the People bore the burden of proof, and that the defense was not obligated to present any evidence, much less call any witnesses.

Hunter moved for a mistrial under *Griffin v. California* (1965) 380 U.S. 609. He argued the prosecutor's arguments regarding E.F. and R.B.'s absence as witnesses constituted misconduct because they misleadingly implied that Hunter had the ability to call E.F. or R.B. but chose not to do so. Hunter stated he had previously sought E.F.'s and R.B.'s contact information from the prosecution four times between 2013 and 2019 to no avail. The prosecution eventually gave Hunter their contact information. Investigators working with Hunter's counsel attempted to locate E.F. and R.B. (using their last known addresses) but were not successful. Hunter argued that the trial court's admonition did not cure the prejudice because the court declined to instruct the jury regarding his counsel's efforts

75

to subpoena E.F.  Sullivan joined in the motion, which the trial court denied.

**3.**

Sullivan maintains that the prosecutor's "false or misleading argument stating that *defense counsel* did not bother" calling certain witnesses violated *his* federal due process rights. (Italics added.)  The unrefuted record shows that the prosecutor's complained-of argument was directed at *Hunter's* counsel, not his.

That Sullivan joined in Hunter's *Griffin* motion brings us no closer to understanding how *Sullivan* has standing to claim that the prosecutor's remarks *about Hunter's counsel* violated *Sullivan's* due process rights.  The prosecutor never told the jury to disregard R.B. and E.F.'s out-of-court statements implicating Hunter as the second shooter.  Instead, the prosecutor suggested that it was the nature of these very statements, which exculpated Sullivan, that led *Hunter*'s counsel not to call them.

Moreover, *Griffin, supra,* 380 U.S. 609 held that the prosecution may not comment on a defendant's silence, including his failure to testify.  (*Id.* at p. 615.)  The *Griffin* rule "does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339)  And here, the trial court admonished the jury that the defense had no obligation to call witnesses or present evidence.

None of the cases cited by Sullivan suggest that further admonishment—about defense efforts to subpoena the witnesses—was required here.  (See *Miller v. Pate* (1967) 386 U.S. 1, 5-6 [prosecution intentionally presented false evidence against single defendant]; *Alcorta v. Texas* (1957) 355 U.S. 28, 29-31 [single defendant's counsel failed to present exculpatory

76

evidence and prosecutor took advantage of that counsel's ineffective assistance by making misleading statements in closing].)  These cases simply are not on point.

## 4.

Sullivan's second assertion of misconduct—involving the prosecutor allegedly casting aspersions on Sullivan's counsel and appealing to the jury's passions—also fails.

During closing argument, the prosecutor argued there were "lot[s] of suggestions, distractions" regarding both Rice and Renesha.  He also argued the defense made "multiple suggestions" of police misconduct "without any kind of follow-up."  The prosecutor cited Sullivan's cross-examination of one officer, where the officer was asked if he had ever pulled Sullivan's "hair or grabbed his testicles."

The prosecutor went on: "You have to ask yourself why that was done. [¶] That was done for a very obvious purpose, which is to have an emotional impact on you that's not tied to the evidence, that's designed to make you - - make it emotionally easier for you to dismiss the gravity of the defendants' actions, right?  It's to normalize how bad these characters are so you will feel free to wipe your hands of this case and how heinous what the defendants did."  Sullivan objected, arguing the prosecutor was casting aspersions.  The trial court overruled the objection.

The prosecutor continued:  "You can't fall for that.  That's insulting to every one of the witnesses who came in here, even the defense witnesses frankly, right?  It's designed to make you not care about the community that this crime occurred in, right?  It has heavy racial overtones, right?  Defense Counsel's opening statement actually claimed I was being racist.  They want to degrade the people involved, from Renesha to [Rice] to [B.K.], so that

77

you can walk away from this and not have to make a decision, right?  It's designed to make it easier for you to give up, and you can't do that."

The prosecutor argued that Rice and the West Point community did not "deserve less justice" because of Rice's gang membership.  He further argued that "[j]ustice is the process where we hold each other accountable to the same set of rules regardless of who you are, where you're from, what color you are, or the quality of your lifestyle . . . . Justice is the promise that we make, and you make specifically as jurors, that you're not just going to abandon each other, abandon this community."

Sullivan objected to the prosecutor's arguments as appealing to the jury's passions and prejudices.  The court overruled the objection but told the prosecutor to "move on."

These alleged aspersions did not constitute misconduct.  The comments were not directed at defense counsel personally.  (See *People v. Breaux* (1991) 1 Cal.4th 281, 305.)  Rather, the prosecutor's "wipe your hands" remarks—while simultaneously telling the jurors that it was their job to care about the victims and be the community's conscience–were made in the broader context of the prosecution's explanation of how the defense sought to "distract" the jury by focusing on issues that were not in dispute (e.g., Rice's gang membership), had limited relevance (e.g., Renesha's involvement in other misconduct that occurred after June 2013), and/or were unsubstantiated (e.g., "multiple suggestions" of police misconduct "without any kind of follow-up").  Sullivan's counsel's question about pulling Sullivan's hair or grabbing his testicles was an example.  In short, no reasonable juror would have construed the remarks as a personal attack on defense counsel's integrity instead of a fair comment on the state of the evidence.  (See *People v. Lawley* (2002) 27 Cal.4th 102, 156 [description of defense evidence as " 'total farce' " and " 'ludicrous' " was fair comment].)

78

Similarly, the prosecutor's "abandonment" argument, when viewed in context, did not imply that the jurors' family and friends would condemn them unless they voted for guilt. Nor did the prosecutor suggest the jury should consider "the 'potential social ramifications' of the verdict" when deciding the case or seek to dehumanize Sullivan.

Read in context, the prosecutor's insistence that the jury not "abandon this community" was a permissible appeal for the jury to take its duty seriously—not an effort to prejudice the jury against Sullivan. (See *People v. Adanandus* (2007) 157 Cal.App.4th 496, 513 [no misconduct where prosecutor urged jurors to "restor[e] law and order" because it was an "appeal for the jury to take its duty seriously, rather than efforts to incite the jury against defendant"].) No reasonable juror would have construed the remarks as urging the jurors to put aside their own judgment and instead consider the potential community response to a "not guilty" verdict. (See *ibid.*; *People v. Lang* (1989) 49 Cal.3d 991, 1041-1042, abrogated on other grounds by *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)

## I.     Extrinsic Evidence

Sullivan argues his Sixth and Fourteenth Amendment rights to confrontation, an impartial jury, and due process were violated by the jury's receipt of extrinsic evidence during deliberations. We disagree.

### 1.

Police transferred the contents of Hunter's cell phone onto a DVD, which was marked for identification as People's Exhibit 23. When the prosecutor moved the court to admit the entirety of Exhibit 23 into evidence, Hunter's counsel said, "I'm objecting to some of the contents that are there. . . . I think we have to have some discussion about

79

that. But I'm not objecting to the admission of the D.V.D. and I'm not objecting to the testimony at all, but . . . [¶] . . . [¶] the specifics that are inside, I'd ask the Court to reserve ruling on that." The court reserved its ruling. Sullivan's counsel's commented, "Perhaps we should do that though before it's published."

The prosecution later moved into evidence excerpts from Hunter's phone, which were marked as separate exhibits. The entire DVD itself (People's Exhibit 23) was never admitted.

During deliberations, the jury sent a note asking for "the contents" of People's Exhibit 23. The trial court said that, after discussing the matter with the parties, it would provide the "entire" DVD to the jurors "with a reminder the attorneys chose only to show them a small fraction of the images on it." But, the court said, "they have asked for the entire thing, so I think it is appropriate to give it to them since it is in evidence."

Sullivan's counsel raised an Evidence Code section 352 objection *on behalf of Hunter's counsel* (who was not present) with respect to "at least 100 images" contained on the DVD that could constitute character evidence. He raised no objection on behalf of Sullivan. The court overruled Hunter's objection and provided the jury with the entire DVD.

After the jury reached its verdicts, a posttrial defense investigation revealed that "multiple" unidentified "jurors reviewed the contents of People's [Exhibit] 23 extensively," and that one unidentified juror—who was purportedly described by another juror as "a 'specialist on cell phones' "—"spent a substantial amount of time examining" the DVD and later "presented the results of his examination" to the jury.

Sullivan moved for a new trial (§ 1181, subds. (2), (3)), arguing that the error amounted to the jury receiving extrinsic evidence. Sullivan supported his motion with a declaration from

his trial counsel. Counsel stated that she "intended to join in" Hunter's objections, after the jury requested the DVD, but failed to do so. Additionally, she meant to include additional grounds—specifically, the Sixth and Fourteenth Amendments—but failed to do so. She had no tactical or strategic reason for her omissions.

The People conceded that Exhibit 23 was mistakenly given to the jury due to "clerical error." The trial court denied the new trial motion without an evidentiary hearing, concluding that Sullivan failed to show a reasonable probability that he would have obtained a more favorable outcome but for the purported error.

We independently review the trial court's denial of a new trial motion asserting juror misconduct. (*People v. Gamache* (2010) 48 Cal.4th 347, 396 (*Gamache*).)

**2.**

It was undisputedly error for the jury to receive an exhibit not admitted into evidence. And we assume (without deciding) that Sullivan's counsel did not forfeit his current argument even though only Hunter's counsel raised a timely objection to the admission of the entirety of Exhibit 23. Nonetheless, Sullivan cannot prevail because he has not shown prejudice.

The question is whether the error was sufficiently prejudicial to require a new trial. (*Gamache, supra*, 48 Cal.4th at p. 396.) Sullivan suggests that the incident amounts to jury misconduct, which would trigger a presumption of prejudice. (*Id.*, at p. 397.) Sullivan also insists that prejudice must be presumed from the "constitutional error," meaning the error is reviewable under the *Chapman, supra,* 386 U.S. 18 standard. The Attorney General, on the other hand, argues this was

81

"ordinary" error subject to the *Watson, supra,* 46 Cal.2d 818 standard because it resulted from clerical error. The Attorney General has the better argument.

"Juror misconduct gives rise to a presumption of prejudice [citation]; the prosecution must rebut the presumption by demonstrating 'there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment.' " (*Gamache, supra*, 48 Cal.4th at p. 397.) In the absence of misconduct, however, "the burden remains with the defendant to demonstrate prejudice under the usual standard for ordinary trial error." (*Ibid*.)

Here, nothing in the record suggests any juror (either actively or passively) obtained extrinsic evidence from sources *outside* the court. (*Gamache, supra*, 48 Cal.4th at p. 398.) Rather, due to a clerical mistake in the exhibit list that showed Exhibit 23 as having been admitted, the trial court provided the jury with an exhibit that had not been admitted. Accordingly, no presumption of prejudice arises. (*Id.* at pp. 398-399; *People v. Cooper* (1991) 53 Cal.3d 771, 836 ["[w]hen . . . a jury innocently considers evidence it was inadvertently given, there is no misconduct"].)

"The situation is the same as any in which the court erroneously admits evidence . . . There has been merely 'an error of law . . . such as . . . an incorrect evidentiary ruling.' " (*People v. Cooper, supra*, 53 Cal.3d at p. 836; accord, *Gamache, supra*, 48 Cal.4th at p. 397.)[11] Accordingly, Sullivan must demonstrate a

---

[11] Relying on a series of older decisions by federal appellate courts, Sullivan insists that our Supreme Court has gotten it "wrong" (italics omitted) and its holdings in cases like *Gamache* are "[an] unreasonable interpretation of settled precedent." Sullivan fails to identify any United States Supreme Court precedent establishing that a presumption of prejudice attaches when a jury innocently considers evidence mistakenly provided

reasonable probability that, in the absence of the error, he would have obtained a more favorable result. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1213-1214.)

He has not done so. Sullivan does not even address the contents of the DVD or explain how there is a reasonable probability *he* would have received a more favorable result but for the jury's inadvertent receipt of the contents of *Hunter's* phone. What we do know is that Cagney, who reviewed the call detail records for the various phones recovered in this case, did not find any messages between Sullivan's and Hunter's phones indicating planning, or any communications with Rice. It is not our role to fashion a prejudice argument on Sullivan's behalf. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 411.)

## J. Juror Intimidation & Misconduct

Sullivan also raises numerous challenges to the adequacy of the trial court's response to alleged juror intimidation or misconduct. The trial court did not abuse its discretion. (See *People v. Cowan* (2010) 50 Cal.4th 401, 506 [standard of review].)

### 1.

A criminal defendant has a fundamental constitutional right to a fair trial by an impartial jury. (See U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *Duncan v. Louisiana* (1968) 391 U.S. 145, 149; *In re Hamilton* (1999) 20 Cal.4th 273, 293 (*Hamilton*).) "An impartial jury is one in which no member has been

---

by the court itself. In the absence of any such binding authority, we must follow our Supreme Court's decisions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456; *People v. Burlington Northern Santa Fe Railroad* (2012) 209 Cal.App.4th 1513, 1531 [decisions of the lower federal courts are not binding on federal questions but merely persuasive].)

improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it." ' " (*Hamilton,* at p. 294.)  "When even one juror lacks impartiality, the defendant has not received a fair trial."  (*People v. Cissna* (2010) 182 Cal.App.4th 1105, 1111.)

Consistent with this right, section 1089 allows the trial court to discharge a juror for cause if the juror, "upon . . . good cause shown to the court is found to be unable to perform his or her duty."  The decision of whether or how to investigate the possibility of juror bias, incompetence, or misconduct rests within the sound discretion of the trial court.  (*People v. Cleveland* (2001) 25 Cal.4th 466, 478.)  A hearing is required only where " 'the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*Ibid*.)  "[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations."  (*Id.* at p. 485.)

Juror misconduct occurs when an overt event directly violates a juror's duties and admonitions, such as when a juror consciously receives outside information, discusses the case with nonjurors, or conveys improper information to the other jurors. (*Hamilton, supra*, 20 Cal.4th at p. 294.)  Where the event involves an attempt at juror intimidation, "[a] sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice."  (*Id.* at pp. 294-295.) Misconduct by a juror, or a nonjuror's unauthorized communication with a sitting juror *about the matter pending before the jury* (the defendant's guilt or innocence) raises a rebuttable presumption of prejudice.  (*Id.* at pp. 295, 305-306.) But "it is virtually impossible to shield jurors from every contact

84

or influence that might theoretically affect their vote," and "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." (*Smith v. Phillips* (1982) 455 U.S. 209, 217.)

Thus, "whether an individual verdict must be overturned for jury misconduct or irregularity ' " 'is resolved by reference to the substantial likelihood test, an objective standard.' " ' " (*Hamilton, supra*, 20 Cal.4th at p. 296.) "Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant." (*Ibid.,* italics omitted.)

**2.**

A.R.[12] was the sole African American juror. He lived with his wife and two adult sons in Bayview / Hunter's Point. During voir dire, he disclosed that he lived "three blocks" from where the shooting took place and "drove by the incident" but said it would not affect his ability to be fair and impartial.

On the seventh day of deliberations, the jury sent a note, written by Juror No. 11 and signed by the foreperson (Juror No. Six),[13] saying that A.R. needed to speak with the court immediately regarding "[j]uror intimidation issues."

When questioned individually by the court (in the presence of the prosecutor and Sullivan's defense counsel), A.R. said he slept poorly the night before. He reported that his wife did not pick him up from court the prior evening as

---

[12] As discussed in section A., A.R., Juror Badge No. 4853308, was originally seated as Juror No. Nine.

[13] Juror Badge No. 5052031 was seated as Juror No. Six.

usual. When he got home, his family would not speak with him. His wife told him she overheard someone at work talking about his jury service. A.R. told the court that "the whole neighborhood" knows him and his wife, adding that the neighborhood "know[s] that I'm on the trial and we are in at the deliberation." Moreover, although he never discussed the case with his wife, his wife seemed to be aware of what the case was about based on talk at her work, that it involved a shooting in the neighborhood, and she was upset by the whole matter.

A.R. also said he thought he saw a black car follow him home over the weekend and sit outside his house for approximately five minutes. While he was waiting for the bus to take him to the courthouse, he thought he saw the same car. He continued, "the tint was so dark . . . I don't know who was driving. And it just went down the hill. It could be a coincidence; I don't know."

A.R. said his wife became upset and scared after she overheard people in the neighborhood discussing the fact that he was a juror on this case. A.R. said he had told the other jurors about his concerns and that his fellow jurors urged him to tell the court. A.R. said he wanted to ensure his family's safety.

A.R. told the court that his experiences with the black car, his wife's behavior, and hearing that people at his wife's work were discussing his role as a juror in the case were all affecting his ability to serve impartially on the jury. The court asked if the juror felt his wife was essentially signaling that she wanted him to vote not guilty for his family's safety. "She's not saying it in those words, but I can get the feeling," the juror responded. The court then asked whether the familial pressure was making him "less inclined" to return a guilty vote "if that was your inclination?" "I think so," the juror said.

The trial court discharged A.R. from the jury, explaining that it was "clear that . . . [A.R.'s] ability to perform [his] function as a juror is negatively [a]ffected by everything [he's] told us."

The court moved one of the alternates, Juror No. 13,[14] into the ninth seat. The court told the jurors not to consider the substitution for "any reason, any purpose." The court also instructed the jurors that they were to disregard all prior deliberations, begin deliberations anew, and "decide this case as if the earlier deliberations had not taken place."

Outside the presence of the jury, Sullivan moved for a mistrial on the ground that the court erroneously refused to inquire further. The court initially denied the motion for lack of irreparable prejudice and said it would consider conducting a further inquiry after the lunch break.

During the afternoon session, the court questioned the foreperson, Juror No. Six, who signed the note on behalf of A.R. Juror No. Six said that when he first saw A.R. that morning, he "didn't look quite normal, like something was wrong." A.R. told him he slept poorly the night before, that his wife had overheard two people at work commenting on how her husband (A.R.) was one of the deliberating jurors, and that he had seen a black car at or near his home at least twice. Juror No. Six confirmed that this was said in the presence of the entire jury. Juror No. Six said they told the former juror that " 'none of this matters,' " and that he should prioritize his family's safety. Other jurors similarly encouraged A.R. to take care of

---

[14] Juror Badge No. 4853331 was Juror No. 13. The jury reached its verdicts against Sullivan one day after the substitution.

himself and his family. At that point, Juror No. 12[15] volunteered seeing someone on a bicycle wearing a "Halloween" mask. However, Juror No. Six told the court that he "didn't really see any kind of relation" between the two.

The court asked if any of the 11 jurors indicated that A.R.'s concerns affected their ability to serve as jurors. Juror No. Six said, "I don't think so," adding that the jurors collectively asked if anyone else felt in danger. No one spoke up, the foreperson said, and he "didn't get th[e] sense" that this would affect the other jurors' judgment. Juror No. Six added that he did not personally feel in danger or that his ability to be neutral was affected. Juror No. Six said, "I honestly think that this really doesn't change anything," before adding that he could not "speak for everyone."

After an unreported conference with the prosecutor and Sullivan's counsel, the court asked Juror No. Six whether A.R. mentioned any other concerns. Juror No. Six said A.R. mentioned that he lived in the community where the shooting occurred and saw "a lot of people in the gallery" that he knew from the neighborhood. Juror No. Six appeared to refer to voir dire and said that A.R. expressed some concerns just based on living in the neighborhood.

Juror No. Six was instructed to continue deliberations and not discuss with anyone else the issues raised during the hearing. At this point, Sullivan's counsel renewed his motion for mistrial, arguing that A.R.'s comments, as well as those relayed by Juror No. Six, "creat[ed] a climate of fear and prejudice" in the deliberation room and inappropriately introduced outside matters.

The court denied the motion, reasoning there was no factual support for Sullivan's claim that A.R.'s concerns affected the other jurors' abilities to uphold their oaths and follow the law.

[15] Juror Badge No. 4802591 was seated as Juror No. 12.

88

The court stated A.R.'s concerns were personal to him and arose because he lived in the Bayview/Hunters Point neighborhood, the other jurors apparently recognized as much, and that there was no other evidence suggesting any impairment of the other jurors' impartiality.

Later the same day, Juror No. Six submitted another note, which stated A.R. also told the other jurors he saw a "guy going through his backyard" at some point that was unclear and appeared to cite that as one of his safety concerns. The court thanked Juror No. Six, instructed him not to discuss the matter further with the other jurors, and to continue with deliberations.

Sullivan again moved for mistrial. Referring to Sergeant Manning's testimony about "creeping" (where someone goes to a rival's neighborhood to intimidate them), Sullivan's counsel argued that it sounded like A.R. had experienced the same or similar behavior. Defense counsel reiterated that these factors collectively created a "poisonous atmosphere in the jury room" such that the jury, "while they may be glad that they're white . . . or Asian and don't live in this neighborhood, it underlines the idea that a black person . . . is not safe with certain people on the streets."

The prosecutor again argued that those might be reasons why A.R. felt unsafe but that it was "pretty clear" from Juror No. Six's statements that those concerns were not shared by the rest of the jurors. The prosecutor also argued that A.R. appeared to be more focused on marital harmony than general safety concerns. Finally, the prosecutor argued that Juror No. Six's comments did not lay the "factual predicates" for a mistrial.

Sullivan's counsel argued that A.R. was "quite clear" that he feared for his family's safety, that he shared those

concerns with the rest of the jurors, and that this obligated the court to poll *all* the jurors. The trial court said it limited the inquiry out of concerns that the jurors' "independent deliberation" would otherwise have been affected. The court found a larger investigation was not warranted because Juror No. Six had suggested the other jurors were unaffected by A.R.'s comments, and denied the motion for mistrial.

Following his conviction, Sullivan argued that he was entitled to a new trial (§ 1181, subd. (2)) because the other jurors discussed A.R.'s removal despite the court's explicit instructions not to. The motion was supported by a declaration from Juror No. 13—the alternate who replaced A.R.— who said the other jurors told him A.R. was excused "because he lived in the Bayview neighborhood where the events took place and had received death threats." After hearing argument, the court denied the motion, saying it found no substantial likelihood that one or more jurors were biased against Sullivan given the court's instructions not to consider A.R.'s substitution for any purpose, as well as the nature of A.R.'s disclosures, the surrounding circumstances, and the entirety of the record.

**3.**

Sullivan argues conditionally that "[*i*]*f* [A.R.] was excused solely based upon marital discord," *then "the juror was improperly excused, and* the trial court abused its discretion in treating [this] inquiry . . . differently from its inquiry of other jurors."

Section 1089 allows the trial court to discharge a juror if the juror, "upon . . . good cause shown to the court is found to be unable to perform his . . . duty." Because Sullivan did not object to the court's discharge of A.R., he forfeited this argument on appeal. (See *People v. Ashmus* (1991) 54 Cal.3d 932, 986-987 & fn. 16, disapproved on other grounds by *People v. Yeoman* (2003) 31 Cal.4th 93, 117.)

90

Even if his claim was not forfeited, we have no trouble concluding that A.R.'s inability to perform his duties as a juror appears in the record as a demonstrable reality. (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 [heightened standard of review applies].) And a juror's demonstrated inability to render a fair and unbiased verdict constitutes good cause for removal. (See *People v. Hecker* (1990) 219 Cal.App.3d 1238, 1244-1245.) Furthermore, unwillingness or inability to deliberate— resulting from both trial-related and non-trial-related stress—constitutes good cause. (See *People v. Fudge* (1994) 7 Cal.4th 1075, 1099–1100 [anxiety about new job]; *People v. Warren* (1986) 176 Cal.App.3d 324, 326–327 [juror was so intimidated by other jurors she was likely to vote with majority and against her own conscience].)

The trial court relied on A.R.'s own testimony that he was unlikely to be able to deliberate impartially—he was now more likely to reflexively acquit—due to *both* marital strain *and* fear for his family's safety, which was corroborated by Juror No. Six's testimony. This establishes a demonstrable reality that A.R. was no longer able to perform his duty as a juror.

**4.**

Sullivan primarily contends that the trial court improperly limited its inquiry regarding the remaining jurors' impartiality—despite these jurors having learned of the events involving A.R. and his resulting fear—because it did not question any jurors others than A.R. and Juror No. Six. We disagree.

In assessing whether the trial court abused its discretion by failing to question jurors other than A.R. and Juror No. Six, we are mindful that " 'not every incident involving a juror's conduct requires or warrants further

91

investigation.' " (*People v. Martinez* (2010) 47 Cal.4th 911, 941-942.)  And a juror's fear, standing alone, does not establish bias or a valid basis for discharge.  (*People v. Manibusan* (2013) 58 Cal.4th 40, 56; see *People v. Brown* (2003) 31 Cal.4th 518, 581-582 [all 12 jurors' concerns regarding gang retaliation after verdict did not require evidentiary hearing because no indication fear affected jury's deliberations].)  The proper inquiry is not whether A.R.'s disclosures to the other jurors created fear or safety concerns in the other jurors' minds, but whether the objective circumstances give rise to a substantial likelihood that one or more jurors was actually biased against Sullivan.  (See *Hamilton, supra*, 20 Cal.4th at pp. 296, 304-306 [objective circumstances of juror's report—that she saw defendant's sister parked in an alley behind her home—did not give rise to substantial likelihood that encounter resulted in actual bias against defendant].)

The trial court's decision to limit its inquiry was reasonable under the circumstances because the entirety of the record did not show a substantial likelihood that any of the remaining jurors were actually biased against Sullivan.  The only incidents of direct communication involved A.R., his wife, and her coworkers.  And even the communications between A.R. and his wife—or the acts of the unknown persons driving the black car or spotted in A.R.'s backyard—do not constitute direct threats or concern Sullivan's guilt or innocence.  (See *Hamilton, supra*, 20 Cal.4th at pp. 305-306 [" 'when the alleged misconduct involves an unauthorized communication with or by a juror, *the presumption [of prejudice] does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant'* "], italics added.)  Nor is there anything in the record to suggest that any of the possibly intimidating acts A.R. reported were done by people supporting Sullivan (rather than

92

people wholly unrelated to the trial, or people supporting Westmobb).

Here, the court questioned A.R. extensively and then summoned the foreperson, Juror No. Six. The court asked Juror No. Six if he or any other juror felt unsafe or otherwise felt their ability to continue deliberating was compromised by A.R.'s disclosures. Juror No. Six denied any such impact. He added that the other jurors had an opportunity to speak up if they felt they were affected by A.R.'s disclosures but had not done so. Believing the foreperson's responses, which included representations of the other jurors' views, the court reasonably concluded that no further inquiry was necessary because there was no suggestion of any effect on the other jurors' willingness or ability to deliberate impartially.

Other jurors could have submitted a note if they believed their abilities to deliberate impartially were affected by A.R.'s disclosures. No one did. On this record, the trial court could reasonably infer from interviewing Juror No. Six and A.R., as well as the silence from the other jurors, that the other jurors believed A.R.'s concerns were personal to him and that those concerns did not affect their ability to continue deliberating impartially. (See *People v. Manibusan, supra*, 58 Cal.4th at p. 56.) Further inquiry ran the risk of calling undue attention to security concerns and possibly spreading those fears while intruding on the jurors' private deliberations. (See *People v. Navarette* (2003) 30 Cal.4th 458, 500; *People v. Cleveland, supra,* 25 Cal.4th at p. 485.)

The record does show that Juror No. 12 had expressed, during the presentation of the evidence, that she felt intimidated by the presence of gang members in the audience and, during discussion of A.R.'s situation during

deliberations, brought up having seen someone wearing a "Halloween" mask. The court did not question Juror No. 12 about her feelings of intimidation either during the presentation of evidence or during deliberations. Sullivan asked the trial court to inquire of all jurors after A.R.'s experience came to light. But he did not argue that the Halloween mask comment constituted an independent basis to investigate Juror No. 12 for bias. Thus, we agree with the People that Sullivan's failure to raise the issue below forfeited the issue on appeal. (*People v. Dykes* (2009) 46 Cal.4th 731, 808, fn. 22.) In any event, we conclude that Juror No. 12 expressed at most ambiguous safety concerns, which are insufficient to mandate further investigation for bias. (*People v. Manibusan, supra*, 58 Cal.4th at p. 56; *Hamilton, supra*, 20 Cal.4th at pp. 304, 306.)

Sullivan relies on *People v. Hem* (2019) 31 Cal.App.5th 218, which he claims is "indistinguishable." We disagree. In *Hem*, the defendant came forward with evidence that a third of the jurors violated their oaths by improperly discussing the case in a courtroom hallway (outside the presence of the entire jury), one or more had expressed worry about " 'letting [defendant] out so he could kill someone else's kid,' " and that one or more had been improperly considering punishment. (*Id.* at pp. 221-222, 226, 229.) This evidence "demanded an inquiry—albeit a careful one, respecting the jurors' deliberative processes." (*Id.* at p. 227.) "[W]hat was unknown was the extent of the misconduct. Exploring that question would not have been a 'fishing expedition,' but would have been a necessary step to preserve defendant's right to a fair jury trial." (*Ibid*, italics omitted.) Accordingly, the trial court's refusal to conduct *any* inquiry constituted an abuse of discretion and the undisputed juror misconduct triggered a presumption of prejudice, which could not be rebutted. (*Id.* at pp. 226-231.)

94

Here, in contrast, the trial court *did* conduct an inquiry—it extensively questioned A.R. and the jury's foreperson.  Although it became clear that A.R. was no longer able to deliberate impartially, the trial court's inquiry revealed that the jurors' deliberations were otherwise unaffected.  Thus, Sullivan's reliance on *Hem* is misplaced.

Sullivan's reliance on *United States v. Angulo* (9th Cir. 1993) 4 F.3d 843, is also misplaced.  In that case, a juror received an anonymous phone call at home in which the caller said, " 'I know where you live.' " (*Id.* at p. 846.) The threatened juror told her fellow jurors about the call and asked if they received a similar call.  None had.  The juror also told the trial court about the call, how it made her feel threatened, and that she had shared her concerns with the other jurors.  (*Ibid.*)  The trial court discharged the juror without conducting *any* further inquiry with (or giving instruction to) the remaining jurors.  (*Id.* at p. 847.) The reviewing court remanded with instructions to hold an evidentiary hearing.  (*Id.* at p. 848.)

*Angulo* is distinguishable for the same reasons as *Hem*—the trial court here *did* investigate and it instructed the remaining jury members to not discuss or consider the substitution for any reason.

Although it might have been better practice for the trial court to conduct a more exhaustive inquiry, a court does not necessarily abuse its discretion by declining to question every juror when possible juror intimidation is brought to the court's attention.  Neither *Remmer v. United States* (1954) 347 U.S. 227, nor any other California authority we know of, stands for that proposition.  *Remmer, supra*, 347 U.S. 227 stands only for the proposition that, in an instance of potential juror tampering, "[t]he trial court

95

should not decide and take final action ex parte . . . , but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."  (*Id.* at pp. 229-230, italics omitted.)

Here, the trial court conducted such an inquiry.

## 5.

Sullivan argues that the trial court was obligated to instruct sua sponte that the jury should not discuss the substance of A.R.'s disclosures and "not to let it affect their deliberations." Sullivan forfeited the claim by failing to request such an instruction and by failing to request clarification of the CALCRIM No. 3575 instruction that the court *did* give.  (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012; *People v. Pettie* (2017) 16 Cal.App.5th 23, 80.)  In any event, we reject the claim on the merits, since the court *did* instruct the jury not to *consider* the substitution for "any reason, any purpose" and that "[e]ach [juror] must disregard the earlier deliberation[s] and decide this case as if the earlier deliberations had not taken place."

## 6.

Sullivan also maintains that, if the evidence was insufficient to warrant a broader inquiry immediately after the court discharged A.R., then Juror No. 13's declaration (filed with Sullivan's motion for a new trial) necessitated an evidentiary hearing before the court could deny that motion.

"Courts evaluate a motion for a new trial based on jury misconduct in three steps: (1) determine what evidence is admissible; (2) if there is admissible evidence, decide if it establishes misconduct; and (3) if there is misconduct, determine whether it was prejudicial."  (*People v. Flores* (2021) 70 Cal.App.5th 100, 107.)  A trial court exercises broad discretion at

96

each step, and its rulings will not be disturbed absent a clear abuse of discretion. (*People v. Ault* (2004) 33 Cal.4th 1250, 1260.) "We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination." (*People v. Nesler* (1997) 16 Cal.4th 561, 582; accord, *People v. Leonard* (2007) 40 Cal.4th 1370, 1425.)

A trial court has discretion to decide whether an evidentiary hearing is needed to determine the truth of jury misconduct allegations. (*People v. Avila* (2006) 38 Cal.4th 491, 604.) "Defendant is not . . . entitled to an evidentiary hearing as a matter of right. . . . 'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that *prejudicial* misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary *unless* the parties' evidence presents a material conflict that can only be resolved at such a hearing.'" (*Ibid.*, italics added.)

Juror No. 13 stated in their declaration: "During deliberations I heard from other jurors that the juror I replaced, [A.R.], was excused because he lived in the Bayview neighborhood where the events took place and had received death threats." We assume that Juror No. 13's post-trial declaration demonstrates some (limited) misconduct occurred—because, *contrary to the trial court's instruction*, the jury discussed A.R.'s substitution (as well as the underlying circumstances) after he was excused—and that this gave rise to a presumption of prejudice. (See *People v. Nesler, supra,* 16 Cal.4th at p. 578.)

97

Nonetheless, we agree with the People that the trial court reasonably denied Sullivan's motion for new trial without holding an evidentiary hearing. A hearing was not required to resolve any disputed issues of fact. Juror No. 13's declaration suggests that the discussion of A.R.'s substitution was limited and makes clear that "deliberations were recommenced" and that the new jury of 12 "went through the evidence from the beginning." Considering Juror No. 13's declaration, the jury's acquittal of Hunter, and the record of the trial court's initial investigation, Sullivan fails to demonstrate a substantial likelihood of juror bias.

## K.    Cumulative Error

Contrary to Sullivan's assertion, we conclude the prejudice resulting from the errors found or assumed is so minimal—whether considered alone or cumulatively—that there is no reasonable possibility that the errors affected the outcome of the proceedings.

## L.  Resentencing

Sullivan argues (and the Attorney General concedes) that he is entitled to have his sentence vacated and to have the matter remanded to the trial court for a full resentencing. We agree.

As we recently explained in *People v. Flores* (2022) 73 Cal.App.5th 1032, the determinate sentencing laws underwent several significant changes effective January 1, 2022. (*Id*. at pp. 1038-1039; see Sen. Bill No. 567 (2020-2021 Reg. Sess.) (SB 567), Stats. 2021, ch. 731, § 1.3; Assem. Bill No. 124 (2020-2021 Reg. Sess.) (AB 124), Stats. 2021, ch. 695, § 5.3.) As is relevant here, the new legislation amended section 1170, including changes affecting a trial court's discretion to impose an upper term sentence. Section 1170, subdivision (b)(2) now provides that an upper term may be imposed only "when there are circumstances in aggravation of the crime that justify the imposition of a term of

imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

Section 1170, subdivision (b)(6)(B), also now establishes a presumption that the court "shall order imposition of the lower term" if the defendant's " 'youth' "—meaning they were under 26 years old at the time of the offense (see § 1016.7, subd. (b))—was "a contributing factor" in his or her commission of a crime "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6), added by Stats. 2021, ch. 731, § 1.3; see also Stats. 2021, ch. 731, § 3(c); *People v. Bautista-Castanon* (2023) 89 Cal.App.5th 922, 927.)

The People correctly concede that the ameliorative amendments to section 1170, subdivision (b), apply retroactively to Sullivan's case because it was not yet final as of January 1, 2022. (*People v. Flores, supra,* 73 Cal.App.5th at p. 1039.) The People also concede that because Sullivan was 21 years old at the time of the commitment offense, and because the trial court imposed the upper term on counts five and nine without the requisite stipulation or jury finding, remand for resentencing under the amended version of section 1170, subdivision (b), is appropriate.

Sullivan also insists that the sentencing court should be given an opportunity to exercise its discretion to strike or impose lesser firearm enhancements under both sections 12022.5 and 12022.53, subdivision (h), as amended by Senate Bill No. 620, and section 654 as amended by Assembly Bill No. 518 (2021-2022 Reg. Sess.). (See § 654 as amended by Stats. 2021, ch. 441, § 1, eff. January 1, 2022.) The People concede Sullivan's entitlement

to a full resentencing hearing where he can raise these additional issues.

Accordingly, Sullivan's sentence must be vacated and the case remanded for a new sentencing hearing.  On remand, the trial court may revisit all its sentencing choices in light of the new legislation.  (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## DISPOSITION

Sullivan's sentence is vacated and the case is remanded to the superior court for resentencing.  At the new sentencing hearing, the court is directed to resentence Sullivan consistent with current applicable sentencing laws.  The judgment is otherwise affirmed.

BURNS, J.

WE CONCUR:

JACKSON, P.J.
SIMONS, J.

*People v. Sullivan (A163607)*